UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR PUBLICATION

UNITED STATES OF AMERICA,

- versus -

STATEMENT OF REASONS
11-CR-345

LULZIM KUPA,

Defendant.

JOHN GLEESON, United States District Judge:

A.   *Preliminary Statement*

Mandatory minimum sentences for drug trafficking offenses have gotten a lot of attention lately.  Attorney General Eric H. Holder, Jr. recently announced a new "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (the "2013 Holder Policy").[1]  The new policy limits the circumstances in which United States Attorneys can properly invoke these harsh mandatory sentences.  It has the potential to reduce significantly both the unfairness and the unnecessary expense caused by our current federal sentencing regime for drug offenses.

The Attorney General is once again out front on desperately needed reform, as he was with regard to the shameful 100:1 crack to powder cocaine ratio[2] and has been with regard

---

[1]   Memorandum from Eric H. Holder, Jr., Att'y Gen. of the United States, to U.S. Att'ys and Assistant U.S. Att'ys for the Criminal Div. re: Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (Aug. 12, 2013), *available at* http://big.assets.huffingtonpost.com/HolderMandatoryMinimumsMemo.pdf (last visited Oct. 9, 2013) [hereinafter 2013 Holder Policy]; *see also* Eric H. Holder, Jr., Att'y Gen. of the United States, Remarks at the Congressional Black Caucus Foundation Criminal Justice Issues Forum (Sept. 19, 2013), *available at* http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-1309191.html (last visited Oct. 9, 2013); Eric H. Holder, Jr., Att'y Gen. of the United States, Remarks at the Annual Meeting of the ABA's House of Delegates (Aug. 12, 2013), *available at* http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html (last visited Oct. 9, 2013).

[2]   *See Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing Before the S. Comm. on the Judiciary Subcomm. on Crime and Drugs*, 111th Cong. 4-6 (2009) (statement of Lanny

to alternatives to incarceration in both the federal and state systems.[3]  He deserves praise for his

leadership, and there are signs in both Congress[4] and the United States Sentencing Commission[5]

that it is becoming contagious.

This statement of reasons relates to an important subset of the drug offense

mandatory minimum cases[6] – those in which prosecutors use or threaten to use their power to file

---

A. Breuer, Assistant Att'y Gen., Criminal Div., U.S. Dep't of Justice).  The following year Congress passed the Fair Sentencing Act of 2010 § 2(a), Pub. L. No. 111-220, 124 Stat. 2372 (codified as amended in scattered sections of 21 U.S.C.), which reduced the ratio to 18:1, and the United States Sentencing Commission amended the Guidelines ranges proportionately, U.S. SENTENCING GUIDELINES MANUAL app. C, Vol. III, amend. 748, 750 (2011).

[3]      See Holder, Remarks at the Annual Meeting of the ABA's House of Delegates, *supra* note 1 ("[M]y colleagues and I are taking steps to identify and share best practices for enhancing the use of diversion programs – such as drug treatment and community service initiatives – that can serve as effective alternatives to incarceration.  Our U.S. Attorneys are leading the way in this regard – working alongside the judiciary to meet safety imperatives while avoiding incarceration in certain cases."); *see also United States v. Leitch*, Nos. 11-CR-609, 11-CR-457, 11-CR-39, 2013 WL 753445, at *11-12 (E.D.N.Y. Feb. 28, 2013).

[4]      The Smarter Sentencing Act, S. 1040, 113th Cong. (2013), introduced on July 31, 2013 by Senators Dick Durbin, Mike Lee, and Patrick Leahy, would, *inter alia*, (1) enlarge so-called "safety valve" relief from the drug offense mandatory minimums, 18 U.S.C. § 3553(f), to include defendants with up to three criminal history points; (2) make the changes to crack sentences in the Fair Sentencing Act of 2010 retroactive; (3) reduce the ten-year mandatory minimum discussed below and in *United States v. Dossie*, 851 F. Supp. 2d 478 (E.D.N.Y. 2012), to five years; (4) reduce the corresponding five-year mandatory minimum to two years; and (5) direct the Sentencing Commission to make appropriate matching reductions in the Guidelines.  On March 20, 2013 Senators Rand Paul and Patrick Leahy introduced the Justice Safety Valve Act of 2013, S. 691, 113th Cong. (2013), which would extend "safety valve" relief to all federal crimes subject to mandatory minimum penalties.

[5]      The decision by the Department of Justice ("DOJ") to restrict the use of mandatory minimum penalties to the kinds of cases for which Congress enacted them places in clear relief the compelling need for the Commission to delink the Guidelines ranges for drug trafficking offenses from those mandatory minimums.  *See United States v. Diaz*, No. 11-cr-821, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013).  The Commission recently made consideration of that delinkage one of its top priorities.  *See* Press Release, U.S. SENTENCING COMM'N, U.S. Sentencing Commission Selects Policy Priorities for the 2013-2014 Guidelines Amendment Cycle: Continued Work on Mandatory Minimum Penalties, Review of Drug Guidelines on List of Priorities (Aug. 15, 2013), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Newsroom/Press_Releases/20130815_Press_Release.pdf (last visited Oct. 9, 2013) ("The Commission also set out as an important new priority reviewing the sentencing guidelines applicable to drug offenses, including consideration of changing the guideline levels based on drug quantities.").  Attorney General Holder's new policy basically instructs federal prosecutors to consider whether sentences below the advisory ranges are appropriate until those ranges are delinked from the mandatory minimum penalties.  2013 Holder Policy, *supra* note 1, at 3 ("In cases where the properly calculated guideline range meets or exceeds the mandatory minimum, prosecutors should consider whether a below-guidelines sentence is sufficient to satisfy the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).").

[6]      This memorandum focuses on drug trafficking cases, which constitute roughly 93% of all federal drug cases.  *See* U.S. SENTENCING COMM'N, 2012 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 3 (2012) [hereinafter 2012 SOURCEBOOK].

prior felony informations pursuant to 21 U.S.C. § 851. Those prior felony informations[7]

dramatically increase already-harsh mandatory minimum sentences.

My focus here is narrow and my point is simple: as the defendant Lulzim Kupa's

case and countless others show, the government abuses its power to file prior felony

informations in drug trafficking cases. The single most important factor that influences the

government's decision whether to file or threaten to file a prior felony information (or to

withdraw or promise to withdraw one that has previously been filed) is illegitimate. When it

enacted § 851 in 1970, Congress had in mind the world that DOJ asked it to create, in which

federal prosecutors would carefully cull from the large number of defendants with prior drug

felony convictions[8] the hardened, professional drug traffickers who should face recidivism

enhancements upon conviction. But instead federal prosecutors exercise their discretion by

reference to a factor that passes in the night with culpability: whether the defendant pleads guilty.

---

[7] The phrase "prior felony information" is used here to describe the result of a prosecutor's decision to file the information contemplated by 21 U.S.C. § 851, which provides in relevant part as follows:

(a) Information filed by United States Attorney

(1) No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon. . . .

The cases and literature sometimes use the phrase "851 enhancement" to describe the same thing.

[8] The number of defendants eligible for an 851 enhancement is large and growing. *See* UNITED STATES SENTENCING COMMISSION, MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 255 (2011) [hereinafter "MANDATORY MINIMUM REPORT"] (noting that "in a majority of districts, at least one-quarter of all drug offenders were eligible for enhancement under section 851. Specifically, in 62 of 94 districts (66.0%), the rates of drug offenders eligible for enhancement under section 851 were between 25 and 49 percent. In addition, in 29 districts (30.8%), the rates of eligible drug offenders were between 50 and 74 percent. There were only three districts (3.2%) in which less than 25 percent of drug offenders were eligible for enhancement."). The variation in the application of the enhancement is stark. *See id.* (noting that in eight districts, none of the drug defendants with prior drug felonies received the 851 enhancement, whereas in six districts, more than 75 percent of eligible defendants received the enhancement); *see also United States v. Young,* No. CR 12-4107-MWB, 2013 WL 4399232, at *8-12 (N.D. Iowa Aug. 16, 2013) (discussing the lack of uniformity in the application of § 851 enhancements).

To coerce guilty pleas,[9] and sometimes to coerce cooperation as well, prosecutors routinely threaten ultra-harsh, enhanced mandatory sentences that *no one* – not even the prosecutors themselves – thinks are appropriate.  And to demonstrate to defendants generally that those threats are sincere, prosecutors insist on the imposition of the unjust punishments when the threatened defendants refuse to plead guilty.

Prior felony informations don't just tinker with sentencing outcomes; by doubling mandatory minimums and sometimes mandating life in prison, they produce the sentencing equivalent of a two-by-four to the forehead.  The government's use of them coerces guilty pleas and produces sentences so excessively severe they take your breath away.  Prior felony informations have played a key role in helping to place the federal criminal trial on the endangered species list.

On the bright side, like several other features of our current federal sentencing regime that need fixing, it's not difficult to identify where the appropriate use of prior felony informations went off the rails.[10]  The history of this prosecutorial tool explains how we got into the current situation and informs the effort to get out of it.

---

[9]      As used in this memorandum, the term "coerce" is not meant to suggest an overbearing of a defendant's free will, such that a resulting plea of guilty is involuntary in a legal sense.  Rather, it is meant to suggest the use of prosecutorial power to invoke or threaten to invoke a mandatory sentencing provision that would result in a sentence that exceeds fair punishment for the case in order to procure a plea of guilty.  The practice makes the risk of going to trial so great that rational defendants frequently have no choice but to voluntarily plead guilty.

[10]      The mandatory minimums for drug offenses that Congress explicitly intended for kingpins and managers of drug operations – who make up a mere 7% of the federal caseload – went off the rails at birth.  *See Dossie*, 851 F. Supp. 2d at 485-89.  In its haste to enact the Anti-Drug Abuse Act of 1986, Congress stipulated that the mandatory minimums would be triggered by drug type and quantity, rather than by role.  *See Diaz*, 2013 WL 322243, at *4-5*; Dossie*, 851 F. Supp. 2d at 480-81.

The Sentencing Commission's drug offense Guidelines ranges were also born excessively severe because of the Commission's ill-fated decision to discard its empirical data and simply link the ranges for every defendant to the drug types and quantities that triggered the mandatory minimums meant only for a few.  *See Diaz*, 2013 WL 322243, at *5-6.

Finally, the statutory presumption of a sentence other than incarceration for first-time offenders who have "not been convicted of a crime of violence or an otherwise serious offense," 28 U.S.C. § 994(j), was also snuffed out by the original Sentencing Commission, which made a categorical determination that *every* white collar offense, no matter how small in scope or effect, is comparable in seriousness to a violent crime.  *See Leitch*, 2013 WL 753445, at *1.

As just indicated, this statement of reasons assumes there exists an "appropriate use of prior felony informations." In truth, many powerful arguments have been advanced in favor of the repeal of mandatory minimums entirely,[11] and I agree with them. My point here is that as long as the powers currently conferred on prosecutors to enhance drug trafficking mandatory minimums exist, they should not be used for the indefensible purposes of coercing guilty pleas and punishing those who go to trial.

Similarly, I do not address here the constitutionality of the government's use of prior felony informations, which is not a foregone conclusion.[12] That issue is not presented by Kupa's case. Rather, I assume that the government's use of prior felony informations is permissible under the Supreme Court's 1978 decision in *Bordenkircher v. Hayes*. But "[f]ew

---

[11]    *See, e.g.*, *Mandatory Minimum Sentences: Hearing Before the H. Comm. on the Judiciary Subcomm. on Crime, Terrorism and Homeland Security*, 111th Cong. (2009) (statement of Judge Julie E. Carnes, Chair, Criminal Law Comm., Judicial Conference of the United States, *available at* http://judiciary.house.gov/hearings/pdf/Carnes090714.pdf (last visited Sept. 24, 2013) (explaining "why mandatory minimum statutes are systemically flawed and will rarely avoid undesirable outcomes"); Anthony M. Kennedy, Associate Justice, Supreme Court of the United States, Address at the ABA Annual Meeting (Aug. 9, 2003), at 4, *available at* http://www.reentry.net/library/attachment.149465 (last visited Sept. 24, 2013) ("I can accept neither the necessity nor the wisdom of federal mandatory minimum sentences. In too many cases, mandatory minimum sentences are unwise and unjust."); *see also* Gerard E. Lynch, *Sentencing Eddie*, 91 J. CRIM. L. & CRIMINOLOGY 547, 562 (2001); Myrna S. Raeder, *Rethinking Sentencing and Correctional Policy for Nonviolent Drug Offenders*, 14 CRIM. JUSTICE 1, 53 (1999); MICHAEL TONRY, SENTENCING MATTERS 135 (1996); ("Evaluated in terms of their stated substantive objectives, mandatory penalties do not work. The record is clear from research in the 1950s, the 1970s, the 1980s, and the 1990s that mandatory penalty laws shift power from judges to prosecutors, meet with widespread circumvention, produce dislocations in case processing, and too often result in imposition of penalties that everyone involved believes to be unduly harsh."); Stephen Schulhofer, *Rethinking Mandatory Minimums*, 28 WAKE FOREST L. REV. 199 (1993).

[12]    The Supreme Court's 5-4 decision in *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), held that the due process clause of the Fourteenth Amendment does not prohibit a prosecutor from carrying out a threat to re-indict a defendant on a more serious charge if he declines an offered plea bargain. *See id.* at 365 ("We hold only that the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or *facing charges* on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment.") (emphasis added). In that context a jury, which must pass on whether the added charge has been proved beyond a reasonable doubt, acts as a check on the prosecutor's decision to punish the defendant for not pleading guilty. When the punishment takes the form of filing a prior felony information, there is no such check. The prosecutor unilaterally ratchets up the punishment, with no possibility that either a jury or a judge will act as a brake on that authority. And since the decision to significantly increase the sentence is based solely on the defendant's exercise of his right to trial, the filing of a prior felony information is in tension with *Bordenkircher*'s admonitions that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort," and "for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" *Id.* at 363 (citations omitted).

misconceptions about government are more mischievous than the idea that a policy is sound simply because a court finds it permissible."[13]  DOJ's policy regarding prior felony informations has been unsound and brutally unfair for more than two decades.  "It is a grave mistake to retain a policy just because a court finds it constitutional,"[14] and it would indeed be a grave mistake to retain this one.

As discussed below:

- Since 1986, our legislative scheme of drug offense mandatory minimums has included recidivist enhancements that double down on those mandatory minimums or convert them into mandatory life in prison;

- Earlier recidivist enhancements, enacted in the 1950s, were automatically applicable until 1970, when Congress made them discretionary at DOJ's request because they mandated excessively long sentences in too many cases;

- The post-1970 regime, specifically designed by prosecutors to allow them to subject only the truly hardened, professional drug traffickers to harsh recidivist enhancements, was derailed by the sentencing reform movement. Prompted by the United States Sentencing Guidelines, DOJ created a policy that essentially made the filing of prior felony informations automatic again, with an exception for those who plead guilty;

- The reversion to automatic filing of prior felony informations resulted in the past two decades in the entrenched practice of using them to strongarm guilty pleas and to punish those who refuse to plead guilty;

- This practice routinely produces egregiously severe sentences, and judges have uniformly expressed frustration at being required to impose them;

- Prior felony informations have helped to create the dramatically reduced trial rate in the federal system, and the disappearance of trials threatens great damage to our system;

- The 2013 Holder Policy fails to cure the prior felony information problem;

- The Attorney General needs to expressly prohibit the use of prior felony informations to coerce defendants into pleading guilty or to punish those who refuse to do so;

---

[13]     Kennedy, *supra* note 11, at 6.
[14]     *Id.*

- The Attorney General needs to create a policy that narrows the field of eligible defendants so that prior felony informations are filed only against the hardened professional drug traffickers who deserve their extreme severity;

- The Attorney General needs to lead the way toward providing realistic avenues of relief for the many who are serving excessive sentences because of the abusive use of prior felony informations over the past 25 years; and

- If DOJ's power to affect sentencing outcomes so dramatically through the filing of prior felony informations can't be exercised properly, Congress should take that power away.

B.     *The Legislative Scheme*

    1.     *The ADAA's Mandatory Minimums and Enhanced Maximums*

The Anti-Drug Abuse Act of 1986 ("ADAA") created the mandatory minimum sentences and enhanced maximum sentences that are now central features of our federal sentencing landscape. As I have described elsewhere,[15] the ADAA created a five-year mandatory minimum, with a maximum enlarged from 20 to 40 years (the "5-40 count" or the "five-year mandatory minimum") for the managers of drug enterprises. It created a ten-year mandatory minimum, with life as the maximum (the "10-life count" or the "ten-year mandatory minimum"), for the organizers and kingpins. But right from the start Congress made a mistake: the severe sentences it mandated to punish the specific *roles* in drug-trafficking offenses were triggered not by role but by drug type and quantity instead. The 5-40 count is triggered by offenses involving 28 grams of crack, 500 grams of cocaine, or 100 grams of heroin.[16] And instead of hinging the 10-life count on the government's proof of a defendant's leadership or

---

[15]     *See Diaz*, 2013 WL 322243, at *4-5; *Dossie*, 851 F. Supp. 2d 478, 479-80; *United States v. Vasquez*, No. 09-cr-259, 2010 WL 1257359, at *2-3 (E.D.N.Y. Mar. 30, 2010).

[16]     21 U.S.C. § 841(b)(1)(B).

"kingpin" status, Congress simply used larger drug quantities: 280 grams of crack,[17] 5,000 grams of cocaine, or 1,000 grams of heroin.[18]  So if an offense happens to involve a drug type and quantity that triggers a mandatory minimum, *every* defendant involved in that crime, whatever his or her actual role, can be treated like a leader or manager at the option of the United States Attorney.[19]

As Attorney General Holder stated in his recent remarks to the American Bar Association, the new DOJ Policy is explicitly intended to limit the use of those mandatory minimums to the serious, high-level traffickers for whom Congress enacted them.[20]

2.     *The Effect of Prior Drug Convictions on the Mandatory Minimums*

21 U.S.C § 841 ratchets up the mandatory minimums for recidivist drug offenders.  Specifically, it provides that where a defendant was previously convicted of a felony drug offense, the five-year and ten-year mandatory minimums are doubled.[21]  For a defendant with two or more prior drug felonies, the ten-year mandatory minimum is increased to mandatory life in prison.[22]  The term "felony drug offense" is defined very broadly.[23]  Even low-

---

[17]     The quantities for crack reflect the current thresholds.  Before the Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2(a), was enacted, an offense involving only five grams of crack triggered the five-year mandatory minimum and an offense involving 50 grams of crack triggered the ten-year mandatory minimum

[18]     21 U.S.C. § 841(b)(1)(A).

[19]     A defendant is subject to the mandatory minimum only if the charging instrument puts him on formal notice of it by alleging the requisite type and quantity of drug and citing the relevant penalty provision.  *See, e.g.*, *United States v. Thomas*, 274 F.3d 655, 663 (2d Cir. 2001); *United States v. Gonzalez*, 420 F.3d 111, 115, 130-31 (2d Cir. 2005).

[20]     Holder, Remarks at the Annual Meeting of the ABA's House of Delegates, *supra* note 1 ("I have today mandated a modification of the Justice Department's charging policies so that certain low-level, nonviolent drug offenders who have no ties to large-scale organizations, gangs, or cartels will no longer be charged with offenses that impose draconian mandatory minimum sentences.  They now will be charged with offenses for which the accompanying sentences are better suited to their individual conduct, rather than excessive prison terms more appropriate for violent criminals or drug kingpins.  By reserving the most severe penalties for serious, high-level, or violent drug traffickers, we can better promote public safety, deterrence, and rehabilitation – while making our expenditures smarter and more productive.").

[21]     21 U.S.C. § 841(b)(1)(A)-(B).

[22]     21 U.S.C. § 841(b)(1)(A).

[23]     21 U.S.C. § 802(44) (a "felony drug offense" is any "offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances").

level drug possession convictions that produce probationary sentences qualify. And recency is

irrelevant; even convictions so old the Guidelines do not include them in a defendant's criminal

history score count. In short, the second most severe sentence in our system – mandatory life

imprisonment – can be triggered by two ancient and minor drug convictions that do not even

constitute felonies under federal law.[24]

### 3. Prior Felony Informations

The mandatory language of 21 U.S.C. § 841 creates the impression that every

defendant with one or more prior drug felony convictions who faces a mandatory minimum is

automatically subjected to the enhanced mandatory minimums.[25] But another statute – 21 U.S.C.

§ 851 – provides that no drug trafficking defendant can face an enhanced mandatory minimum

unless certain procedures, including the filing of a prior felony information by the prosecutor, are

followed.[26] Unless the prosecutor files a timely prior felony information pursuant to 21 U.S.C. §

---

[24]    *See generally Young*, 2013 WL 4399232, at *3. By contrast, the Armed Career Criminal Act
("ACCA"), 18 U.S.C. § 924(e)(1), provides a fifteen-year mandatory minimum sentence for certain defendants only
if the predicate offenses are either "serious drug offenses" or "violent felonies." To qualify as "a serious drug
offense" under ACCA, the offense must call for "a maximum term of imprisonment of ten years or more." 18 U.S.C.
§ 924(e)(2)(A)(ii).

[25]    *See, e.g.*, 21 U.S.C. § 841(b)(1)(A) ("If any person commits such a violation after a prior
conviction for a felony drug offense has become final, such person *shall be sentenced* to a term of imprisonment
which may not be less than 20 years and not more than life imprisonment . . . .") (emphasis added).

[26]    21 U.S.C. § 851(a)(1) states that "[n]o person who stands convicted of an offense under this part
shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before
entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such
information on the person or counsel for the person) stating in writing the previous convictions to be relied upon."
As for the procedures, the government must first file an information "before trial, or before entry of a plea of guilty .
. . stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a). Then, after conviction but
before sentence, the court must ask the defendant "whether he affirms or denies that he has been previously
convicted as alleged in the information." *Id.* § 851(b). If the defendant affirms the facts as alleged, the court is
obligated to impose the enhanced sentence. *Id.* § 851(d)(1). However, if the defendant denies "any allegation of the
information of prior conviction, or claims that any conviction alleged is invalid," the defendant must file a written
response laying out the basis for the challenge. The court then must hold an evidentiary hearing to resolve any
dispute. The government bears the burden of proof beyond a reasonable doubt on any issue of fact. *Id.* However, if
the defendant alleges that the prior conviction was obtained in violation of the federal constitution, the defendant
must first "set forth his claim, and the factual basis therefor, with particularity in his response to the information
[and] . . . shall have the burden of proof by a preponderance of the evidence on any issue of fact raised by the
response." 21 U.S.C. § 851(c)(2). The defendant may not challenge the validity of a prior drug felony more than
five years old. *Id.* § 851(e). *See generally United States v. Espinal*, 634 F.3d 655, 662-63 (2d Cir. 2011).

851 listing the prior felony or felonies to be relied upon, the enhanced mandatory minimums will not apply.

It was not always this way. Recidivism-based mandatory minimums for drug traffickers are not new, and they used to be automatic. The first version of what would eventually become 21 U.S.C. § 851 *required* prosecutors to file informations identifying prior convictions.[27] The Boggs Act of 1951 created mandatory minimum sentences for drug trafficking and possession offenders. Specifically, it established a minimum prison term of two to five years for the first offense, even simple possession offenses. As for recidivist enhancements, it mandated minimum prison terms of five to ten years for the second offense and ten to fifteen years for the third.[28] It was thought at the time that requiring lenient judges to impose jail terms would "dry up the traffic" in narcotics."[29] Five years later, the Narcotic Control Act of 1956 raised the mandatory minimum to five years for the first offense and ten years for all subsequent convictions; suspended sentences were prohibited, as was probation.[30]

---

[27] 26 U.S.C. § 2557(b)(7) ("Whenever it shall appear, after conviction and before or after sentence, that a person convicted of unlawfully selling, importing, or exporting, or conspiring unlawfully to sell, import, or export, any of the narcotics drugs enumerated [herein] has previously been convicted of [a drug offense] in violation of the laws of the United States, *it shall be the duty of the United States district attorney for the district in which such subsequent conviction was had to file an information* alleging that the defendant has previously been so convicted, and further alleging the number of convictions . . . .") (emphasis added). Section 2557 was amended by the Boggs Act of 1951 to revise the procedure for filing prior felony informations, but Congress continued to mandate prosecutors to provide notice of all known prior drug felonies. 28 U.S.C. § 2257(b). In 1954 § 2557 was renumbered as § 7237.

[28] Boggs Act, Pub. L. No. 82-255, 65 Stat. 767 (1951) (repealed 1970). *See generally* MANDATORY MINIMUM REPORT, *supra* note 8, at 22-23; FAMILIES AGAINST MANDATORY MINIMUMS, CORRECTING COURSE: LESSONS FROM THE 1970 REPEAL OF MANDATORY MINIMUMS 7 (2008).

[29] 97 Cong. Rec. 8197, 8198 (1951) (statement of Harry J. Anslinger, Commissioner of the Treasury Department's Federal Bureau of Narcotics (as quoted by Rep. Boggs)) ("There should be a minimum sentence for the second offense . . . . [O]n the second offense, if there were a minimum sentence of 5 years without probation or parole, I think it would just about dry up the traffic."); *see also Drug Abuse Control Amendments 1970, Part 2: Hearing on H.R. 11701 and H.R. 13743 Before the Subcomm. on Pub. Health and Welfare of the H. Comm. on Interstate and Foreign Commerce*, 91st Cong. (1970), H.R. Rep. No. 91-46, at 733 (statement of Hon. Price Daniel, former U.S. Senator and Governor of Texas) (noting that prior to the Boggs Act of 1951 "there were many judges passing out [lenient] sentences even on second and subsequent offenses" and advocating for the House to retain minimum penalties for "professional [drug] peddlers" who commit repeat offenses).

[30] Narcotic Control Act of 1956 § 103, Pub. L. No. 84-728, 70 Stat. 567 (repealed 1970); *see generally* CORRECTING COURSE, *supra* note 28, at 9.

These mandatory enhancements had such a dramatic effect on sentences that federal prosecutors found themselves reluctant to bring any charges at all against certain defendants because the automatic mandatory enhancements were simply too severe.[31]  As a result, Attorney General John N. Mitchell asked Congress to enact a law affording prosecutors greater flexibility:

> The greatest enforcement problem with the existing penalty structure is that it is too severe in relation to the culpability of the user and the dangers of the drugs . . . . The result has been a reluctance on the part of prosecutors to prosecute . . . under the existing penalty structure.  The new penalty structure will increase the credibility of the law and the resultant deterrent effect while at the same time providing sufficient flexibility to allow the punishment to fit the crime and the offender.[32]

Commissioner John E. Ingersoll of the Bureau of Narcotics and Dangerous Drugs[33] testified about the need for a penalty provision that would reserve the highest penalties for true "professional criminals":

> I think we are going to get more convictions because of the greater flexibility that is provided to courts in sentencing, and the higher penalties that are reserved for the professional criminals . . . .  The existing penalties are really out of proportion to penalties that are contained in other parts of the Federal law.  For example,

---

[31]     The severe penalties were imposed on all recidivist defendants, even those whose crimes were the result of a drug addiction.  *See, e.g.*, *United States v. Ross*, 464 F.2d 376, 381 (2d Cir. 1972) (sentenced a recidivist drug offender the government stipulated was a drug addict at the time of his arrest to the mandatory sentence of 10 years).  In *Simon v. United States*, 269 F. Supp. 738, 741 (E.D. La. 1967), the court denied a collateral attack on a ten-year sentence imposed on a recidivist drug offender pursuant to 26 U.S.C. § 7237(b).  The prior drug felony was almost twenty years old and because the defendant was an addict, he "was anxious to go to the hospital, [and] wanted to plead guilty as soon as possible."  When the court imposed the ten-year mandatory sentence, it noted "I am giving you the minimum.  I can't give you anything else.  I appreciate what you have told me, but I can't help it. I can't give you one minute less than 10 years."  *Id.*

[32]     *Drug Abuse Control Amendments 1970, Part 1: Hearing on H.R. 11701 and H.R. 13743 Before the Subcomm. on Pub. Health and Welfare of the H. Comm. on Interstate and Foreign Commerce*, 91st Cong. (1970), H.R. Rep. No. 91-45, at 81 (statement of John N. Mitchell, Att'y Gen of the United States), *available at* www.justice.gov/ag/aghistory/mitchell/1970/02-03-1970.pdf (last visited Sept. 11, 2013).  DOJ drafted the penalty portion of the bill ultimately enacted into law.  *See id.*

[33]     Beginning in 1968 the Bureau of Narcotics and Dangerous Drugs ("BNDD") was a bureau within DOJ; it is the predecessor of the modern Drug Enforcement Administration ("DEA").

> manslaughter, involuntary manslaughter, draws a lesser penalty
> than presently is available to a person who smuggles marijuana
> into the country.[34]

Ingersoll acknowledged that not all second offenders are necessarily "professionals," and stated that "the burden should remain upon [the government] to prove the status of professionalism as far as the defendant is concerned."[35]

In 1970, Congress responded by enacting 21 U.S.C. § 851, which, as discussed above, conditions the applicability of any recidivist enhancements to the drug offense mandatory minimums on the filing of a prior felony information. The 1970 legislation thus gave the government the flexibility it requested.

But Congress did not stop there. Over the objections of DOJ, it also repealed the previously-existing mandatory minimums and created a single, ten-year mandatory minimum built into the so-called "kingpin" statute, 21 U.S.C. § 848.[36] In the ensuing 16 years, prior drug felonies operated only to enlarge the *maximum* sentence for drug trafficking. Specifically, the 1970 statute provided for a maximum sentence of up to 15 years in prison for the first offense and up to 30 for subsequent offenses. Since the enlarged maximum sentence did not restrict

---

[34]    H.R. REP. No. 91-45, *supra* note 32, at 81 (statement of John Ingersoll, Comm'r of BNDD ).

[35]    *Narcotics Legislation: Hearing on S. Res. 48, S. 1895, S. 2590, and S. 2637 Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 91st Cong., S. Doc. No. 521-3, at 681 (1969); *see also id.* at 1-2 (Subcommittee Chairman Thomas J. Dodd noting that "thousands of . . . people arrested for one drug offense or another are not hardened criminals leading lives of lawbreaking and violence."). During the hearing, Chairman Dodd underscored his view that "[e]very second offender is not a hardened criminal or a professional criminal," and noted the government has "plenty of machinery to get [the second offender] if . . . he is determined to be a professional." *Id.* at 681.

[36]    The legislation created § 848, which is also known as the "CCE" offense. It requires the government to prove, *inter alia*, that the defendant engaged in a series of continuing narcotics violations undertaken with five or more others with respect to whom the defendant had a managerial role. (The 10-year mandatory minimum was later elevated to 20 years). DOJ did not want Congress to repeal the Boggs Act's mandatory sentences; Commissioner Ingersoll urged it to retain mandatory minimums for second offenders selected by the government for such punishment. *See Narcotics Legislation: Hearing on S. Res. 48, S. 1895, S. 2590, and S. 2637 Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 91st Cong. 679-681 (1969) (statement of Ingersoll) ("[W]hen a man or a defendant comes around for a second time for a hard narcotic sale[] or distribution offense, he is a professional engaged in this kind of activity . . . we then have to consider the welfare of society.").

judges' discretion to impose a just sentence, the controversy surrounding mandatory minimums that preceded 1970 (which would reappear after 1986) disappeared.

In sum, § 851 reflected the recognition by Congress and DOJ that a prior drug felony conviction was not *per se* evidence that a drug trafficking defendant was the sort of hardened professional criminal who deserves an enhanced mandatory sentence. Congress left it to prosecutors to identify the defendants who truly deserved the enhancements that remained after 1970. Whereas the previous statutory scheme made no distinctions among (for example) professional criminals, street-corner dealers, and addicts whose pay for participating in the offense consisted solely of the drugs to support their habits, § 851 trusted prosecutors to take into account such individual circumstances, vesting them with the power to be selective.[37]

There was no suggestion that Congress enacted § 851 so prosecutors could use their newfound discretion to trigger enhanced punishments as a tool to strong-arm federal defendants into pleading guilty or to punish those who exercise their right to a trial.

C.     *The Sentencing Reform Movement Brings About a DOJ Policy That Defeats the Purpose of 21 U.S.C. § 851*

1.     *The Sentencing Reform Act of 1984 and the Anti-Drug Abuse Act of 1986*

In 1984, Congress passed the Sentencing Reform Act to address, *inter alia*, the unwarranted sentencing disparities that characterized the indeterminate sentencing regime at the time. The statute created the Sentencing Commission and instructed it to create sentencing guidelines to cabin the discretion of sentencing judges.[38]

---

[37]     *See United States v. Noland*, 495 F.2d 529, 533 (5th Cir. 1974) ("In keeping with this purpose, the new statutory scheme contemplates prosecutorial discretion to seek enhancement. . . . [I]t is obvious that the prosecutor is permitted to select which previous drug felony convictions the Government will rely upon. Both of these provisions of section 851 demonstrate that it is up to the United States attorney to seek enhancement if sentence is to be enhanced.").

[38]     *See* 28 U.S.C. § 991 *et seq.*

13

The Commission's mandate was to promulgate guidelines that would become effective on November 1, 1987. On June 19, 1986, while the Commission was creating the first Guidelines Manual, University of Maryland basketball star Len Bias died of a drug overdose. Congress promptly enacted the ADAA, which established the two-tiered scheme of mandatory minimum and enhanced maximum sentences described above. A single prior conviction for a felony drug offense doubled those mandatory minimums and two such prior convictions converted the ten-year mandatory minimum into a mandatory life sentence.

Neither the Sentencing Reform Act of 1984 nor the ADAA disturbed 21 U.S.C. § 851. Thus, Congress created the power to double drug offense mandatory minimums, and to convert some of them into life sentences, against the backdrop described above. Specifically, those recidivist enhancements were not to be automatically imposed on every drug trafficking defendant with a qualifying prior conviction. Rather, federal prosecutors were supposed to continue to exercise the discretion they asked for and received in § 851 to cull from the large number of defendants who have prior drug convictions the ones who truly deserve those extra-harsh punishments. Indeed, the new recidivist enhancements were much more severe than the ones in place prior to 1970, which themselves were so harsh that DOJ successfully asked Congress to eliminate automatic applicability in the name of fairness and just sentencing. By leaving § 851 intact and applicable to the enhancement of its newly-minted mandatory minimums, Congress ensured that those enhancements would only be triggered after careful consideration of the relevant facts about the offense and the defendant.

2. *The Return to Automatic Recidivist Enhancements through DOJ Policy*

a. *"The Most Serious Readily Provable Offense" Directive*

The newly created Guidelines took sentencing power from judges and placed it in the hands of prosecutors. Prosecutors found themselves in a position where they could influence sentencing outcomes through their charging decisions and plea bargaining. DOJ welcomed the Sentencing Guidelines, which prescribed sentences that were much more severe than those previously imposed, and it was sensitive to the Commission's concern that differences in the exercise of prosecutorial discretion might result in sentencing disparities of the sort the Commission was created to eliminate. In their seminal book on the federal sentencing reform movement, Professor Kate Stith and Judge José A. Cabranes describe the results as follows:

> In the wake of the Guidelines, and in response to the Commission's clear concern that the Guidelines would be undermined by rampant charge and fact bargaining, the Department of Justice abandoned its traditional, hands-off approach toward routine plea bargaining by federal prosecutors in the field. In 1989, federal prosecutors received a new set of instructions on the subject from the Department of Justice in Washington. The "Thornburgh Memorandum," as it came to be known (after the Attorney General who issued it), announced strict limitations on the discretion exercised by individual federal prosecutors in charging and plea bargaining, and provided for monitoring and enforcement of these limitations. The key instruction on charge bargaining states:
>
> [A] federal prosecutor *should initially charge the most serious, readily provable offense or offenses consistent with the defendant's conduct.*
>
> . . . The Thornburgh Memorandum thus imposed on prosecutors essentially the same standards that the Commission had sought to impose on judges and probation officers . . . .[39]

> b. *The Extension of that Directive to Prior Felony Informations*

[39] KATE STITH & JOSÉ A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS 136 (1998) (emphasis added).

Implementing the direction to charge "the most serious readily provable offense" was clear enough when it came to bringing criminal charges, but in 1992 a member of the Sentencing Guidelines Subcommittee of the Attorney General's Advisory Committee observed that the "Thornburgh Memo" was ambiguous when it came to the filing of prior felony informations.[40]  As the chair of the subcommittee put it, "a factor which could make an enormous difference in a defendant's sentence was not effectively covered in the Thornburgh Memo."[41]

The subcommittee therefore debated whether the "most serious readily provable offense" policy required the filing of a prior felony information.[42]  A prior felony information doesn't constitute an additional "offense," but rather elevates the sentence for an already-pending one.  Nevertheless, because the goal of the Sentencing Reform Act was "to ensure uniformity of sentences," the subcommittee felt that prior felony informations introduced an undesirable potential for disparities.[43]  It therefore recommended to the Attorney General that the policy be clarified to require the filing of prior felony informations.[44]  Adopting that recommendation, DOJ issued a policy requiring the filing of a prior felony information whenever the prior conviction is provable.[45]  That policy has remained unchanged since 1992.[46]

---

[40]    Robert H. Edmunds, *The Sentencing Guidelines Subcommittee of the Attorney General's Advisory Committee,* 4 Fᴇᴅ. Sᴇɴᴛ'ɢ Rᴇᴘ. 234 (1992) ("many drug offenses have enhanced penalties if the defendants has one or more prior convictions . . . [but] these enhanced penalties are not self-actuating.").

[41]    *Id*. at 234.

[42]    *Id*. at 235.

[43]    *Id.*

[44]    *Id.*  The issue divided the subcommittee.  *See id.* (noting that the person who "broached the issue did not fully agree with the consensus that emerged").

[45]    Memorandum from George J. Terwilliger, III, Acting Deputy Att'y Gen. U.S. Dep't of Justice, to Holders of United States Attorneys' Manual Title 9 re: Indictment and Plea Procedures Under Guideline Sentencing, *reprinted in* 6 Fᴇᴅ. Sᴇɴᴛ'ɢ Rᴇᴘ. 350 (1994) ("[E]very prosecutor should regard the filing of an information under 21 U.S.C. Section 851 concerning prior convictions as equivalent to the filing of charges.  Just as a prosecutor must file a readily provable charge, he or she *must* file an information under 21 U.S.C. Section 851 regarding prior convictions that are readily provable and that are known to the prosecutor prior to the beginning of trial or entry of a plea.") (emphasis added).

3.    *The 2003 Ashcroft Policy*

In 2003, Congress reacted to what it perceived as excessive sentencing leniency by clamping down on everyone – judges, the Commission, and even DOJ – in the PROTECT Act.[47]  In response, Attorney General John Ashcroft adopted a policy (the "Ashcroft Policy") that further cemented the use of prior felony informations in a way that was flatly contrary to the essential purpose of § 851.  In a memorandum issued to all federal prosecutors on September 22, 2003, the Attorney General once again directed them "to charge and to pursue the most serious, readily provable offense," which was defined as the offense generating the "most substantial sentence."[48]  The memorandum also specifically addressed prior felony informations, "strongly encourag[ing]" their use since they always increase a sentence.[49]  Prosecutors were directed to file them in all instances unless there was some "good faith doubt, for legal or evidentiary reasons, as to the Government's ability readily to prove" the underlying facts.[50]  And of course prior convictions are virtually always readily provable.

Finally, the Ashcroft Policy not only legitimized the abusive use of prior felony informations to coerce guilty pleas, it virtually directed it.  The memorandum expressly acknowledged that a prior felony information produces "in many cases" a statutory sentence

---

[46]    The 2013 Holder Policy makes no change to the longstanding policy requiring AUSAs to consider recidivist enhancements part of the most serious, readily provable offense.  The U.S. Attorneys' Manual continues to direct that prior felony informations remain mandatory. *See* United States Attorneys' Manual § 9-27.300 (Selecting Charges – Charging Most Serious Offenses) ("Every prosecutor should regard the filing of an information under 21 U.S.C. § 851 concerning prior convictions as equivalent to the filing of charges. Just as a prosecutor must file a readily provable charge, he or she must file an information under 21 U.S.C. § 851 regarding prior convictions that are readily provable and that are known to the prosecutor prior to the beginning of trial or entry of plea.).

[47]    *See Diaz*, 2013 WL 322243, at *9 & nn.75-76.

[48]    *See* Memorandum from John Ashcroft, Att'y Gen. of the United States, to All Federal Prosecutors, Department Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing (Sept. 22, 2003), *reprinted in* 16 FED. SENT'G REP. 129, 130 (2003) [hereinafter Ashcroft Policy] ("The most serious offense or offenses are those that generate the most substantial sentence under the Sentencing Guidelines, unless a mandatory minimum sentence or count requiring a consecutive sentence would generate a longer sentence.").  The Ashcroft Policy stated that the goals of the PROTECT Act "cannot be fully achieved without consistency on the part of federal prosecutors." *Id.* at 129.

[49]    *Id.*

[50]    *Id.*

harsher than the applicable guidelines range.[51]  In those circumstances, prosecutors were permitted by the policy to "forego the filing" of the prior felony information in a written plea agreement to give a defendant an "incentive to plead guilty."[52]

### 4. *The 2010 Holder Policy*

The Ashcroft Policy was superseded by a May 19, 2010 memorandum circulated to all federal prosecutors by Attorney General Holder ("2010 Holder Policy").[53]  The memorandum reiterated the "long-standing" principle that prosecutors should charge the most serious offense available, but added that they should also make individualized assessments as to whether such charges are appropriate.[54]  Except to say "the decision whether to seek a statutory sentencing enhancement should be guided by these same principles," the memorandum did not address prior felony informations.[55]  And the memorandum left intact the provisions in the United States Attorney's Manual that direct the filing of prior felony informations and authorize their use as leverage to avoid trials.[56]

---

[51]  *Id.* at 131.

[52]  Specifically, the Ashcroft Policy directed:

> In many cases, however, the filing of such enhancements will mean that the statutory sentence exceeds the applicable Sentencing Guidelines range, thereby ensuring that the defendant will not receive any credit for acceptance of responsibility and will have no incentive to plead guilty.  Requiring the pursuit of such enhancements to trial in every case could therefore have a significant effect on the allocation of prosecutorial resources within a given district.  Accordingly, an Assistant Attorney General, United States Attorney, or designated supervisory attorney may authorize a prosecutor to forego the filing of a statutory enhancement, but only in the context of a negotiated plea agreement . . . .

Ashcroft Policy, *supra* note 48, at 131.

[53]  *See* Memorandum from Eric H. Holder, Jr., Att'y Gen. of the United States, to All Federal Prosecutors, Department Policy on Charging and Sentencing (May 19, 2010) [hereinafter 2010 Holder Policy], *available at* http://www.justice.gov/oip/holder-memo-charging-sentencing.pdf (last visited Oct. 9, 2013).

[54]  *Id.* at 2.

[55]  *Id.*

[56]  Comment B of § 9-27.300 of the United States Attorneys' Manual provides as follows:

The 2010 Holder Policy explicitly stated that "[c]harges should not be filed simply to exert leverage to induce a plea," but the cases discussed in the next section reveal the hollow nature of that admonition.[57]  With the apparent exception of a small number of districts in which prosecutors exercise no discretion at all[58] (that is, they either never file prior felony informations or they always do), prosecutors use their authority precisely as they have been instructed and trained to use it for more than two decades.  As a result, a prosecutorial tool that should be used only against the worst of the worst drug trafficking defendants has instead become a tool to prevent all recidivist drug trafficking defendants from exercising their Sixth Amendment right to trial by jury.

D.    *How the Government Abuses its Power to File Prior Felony Informations*

My focus here is on the use of *enhanced* mandatory minimums, that is, the use of prior felony informations to enhance the standard mandatory minimums (which themselves enhance off-the-rack federal drug trafficking sentences) in order to procure guilty pleas and to

---

Every prosecutor should regard the filing of an information under 21 U.S.C. § 851 concerning prior convictions as equivalent to the filing of charges.  Just as a prosecutor must file a readily provable charge, he or she must file an information under 21 U.S.C. § 851 regarding prior convictions that are readily provable and that are known to the prosecutor prior to the beginning of trial or entry of plea.  *The only exceptions to this requirement are where*: (1) the failure to file or the dismissal of such pleadings would not affect the applicable guideline range from which the sentence may be imposed; or (2) *in the context of a negotiated plea*, the United States Attorney, the Chief Assistant United States Attorney, the senior supervisory Criminal Assistant United States Attorney or within the Department of Justice, a Section Chief or Office Director has approved the negotiated agreement.  The reasons for such an agreement must be set forth in writing.  *Such a reason might include, for example, that the United States Attorney's office is particularly overburdened, the case would be time-consuming to try, and proceeding to trial would significantly reduce the total number of cases disposed of by the office.*  The permissible agreements within this context include: (1) not filing an enhancement; (2) filing an enhancement which does not allege all relevant prior convictions, thereby only partially enhancing a defendant's potential sentence; and (3) dismissing a previously filed enhancement.)

(emphasis added).

[57]     2010 Holder Policy, *supra* note 53, at 2.

[58]     *See Young*, 2013 WL 4399232, at *9-11.

punish defendants who refuse to plead guilty. This focus on the government's abuse of prior felony informations should not obscure the fact that it routinely uses the standard mandatory minimums for the same purposes.[59] The threat of a standard mandatory minimum sentence prevents many more defendants from ever going to trial, a serious problem that I don't intend to minimize here.[60] But they are small potatoes compared to what happens when prior felony informations, or the threat of them, enter the picture.

1. *Using Prior Felony Informations to Coerce Guilty Pleas – Lulzim Kupa*

Because there is no judicial check on the enhanced mandatory minimums prosecutors can inject into a case, they can put enormous pressure on defendants to plead guilty. In many cases only a daring risk-taker can withstand that pressure. Most people buckle under it, and Luzlim Kupa is a perfect example.

Kupa was 36 years old when I sentenced him on August 9, 2013. He was born in Staten Island to parents who had recently come to the United States from Albania. In 1999 and again in 2007 Kupa was convicted of conspiring to distribute marijuana. When he emerged from prison in 2010 after the second conviction, he engaged in drug trafficking again, leading to this case. Kupa was charged with a 10-life count based on the fact that more than five kilograms of cocaine were involved in the offense.

---

[59]     To provide an example I need not go far, as one of defendant Lulzim Kupa's co-defendants, Joseph Ida, is a typical case. Though the government insisted that Ida played a minor role in the charged cocaine conspiracy, it nevertheless elected to subject him to the 10-life count Congress created for kingpins. However, to induce Ida to plead guilty, the government agreed that it would lift the kingpin charge and allow him to plead guilty to the same conspiracy count with no minimum and a 20-year maximum. It further agreed to recommend a sentence within the range of 63-78 months if Ida accepted that offer. I sentenced Ida to 63 months, so his trial penalty (that is, the price he would have paid had he gone to trial and been convicted) would have been 57 months in prison – the difference between the ten years I would have been required to impose and the 63 months he actually got on the recommendation of the government. *United States v. Ida*, No. 11 CR 345 (JG) (ECF No. 224) (plea agreement on file in chambers).

[60]     *See* MANDATORY MINIMUM REPORT, *supra* note 8, at 106 ("Prosecutors in several districts noted possible variations in charge bargaining practices as a result of decisions made by individual prosecutors. In one of those districts, prosecutors related that charges carrying a mandatory minimum penalty might be dismissed if that penalty was not appropriate for the offender *or if the offender made some concessions as part of the plea negotiations*.") (emphasis added).

On March 5, 2013 the government sent Kupa a proposed plea agreement.[61] Despite Kupa's prior marijuana convictions and several other convictions as well – he has a serious criminal history – the agreement promised a withdrawal of the 10-life count and a recommendation to the Court of a sentence within the range of 110-137 months if Kupa would plead guilty. Assuming good time credits, a sentence at the bottom end of the recommended range would result in Kupa serving about seven years and ten months in prison.[62] The email that conveyed the proposed plea agreement stipulated that the offer would expire the next day.

Kupa did not accept the agreement and the case appeared to be headed toward the previously-scheduled April 22, 2013 trial. However, the government wasn't finished encouraging him to plead guilty. On March 15, 2013 it filed a prior felony information providing notice of the two marijuana convictions. Just like that, a defendant for whom the government, only ten days earlier, was willing to recommend an effective sentence of less than eight years was looking at life in prison without the possibility of parole.

Standing alone, the prior felony information was hardly an inducement to plead guilty. If the judge must sentence a defendant to life in prison upon conviction, there's not much reason for him to plead guilty. But the government quickly followed the filing of the prior felony information with another proposed plea agreement, which was conveyed to Kupa's

---

[61] This proposed plea agreement was the fifth out of seven proposed plea agreements sent to Kupa between February 23, 2012 and April 9, 2013.

[62] Pursuant to 18 U.S.C. § 3624,

> a prisoner who is serving a life imprisonment of more than 1 year other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations.

Accordingly, a prison sentence of 110 months would yield approximately 16 months of good time for a total of 94 months.

lawyer on April 4, 2013. That proposal offered to withdraw both the 10-year mandatory minimum and the prior felony information that had turned that mandatory minimum into a mandatory life count if Kupa would plead guilty. It also manipulated the Guidelines range estimate to raise the recommended range to 130-162 months.[63] A sentence at the bottom of that range amounts to an effective sentence of about nine years and four months.[64]

So the plea agreement proposed on April 4, 2013 did two things. First, it punished Kupa for not accepting the previous agreement by providing for a sentencing recommendation that, if accepted, would give him another year and a half or so in prison. But it also gave him some dramatic relief. For the preceding 19 days Kupa was facing mandatory life in prison if he was found guilty, and the proposed plea agreement offered an escape from that daunting prospect – as long as he agreed to plead guilty.

Kupa was given a single day to accept that agreement as well, and he didn't act quickly enough. With the trial fast approaching, the government forwarded yet another proposed plea agreement on April 9, 2013. Once again, the "estimated" Guidelines range and corresponding recommendation were ratcheted slightly upwards; this time Kupa lost the third

---

[63] The government reached the higher range by taking away the two-level adjustment for a minor role that was included in the previous proposed plea agreement. One might think that a defendant's role in the offense doesn't depend on whether (or when) he pleads guilty, but that would be naïve. When I questioned the prosecutor about this, our exchange went as follows:

> THE COURT: Since when does somebody's role depend on when they plead guilty? The role is the role.

> GOVERNMENT: Your honor, he rejected the previous offer.

April 10 Tr. at 29. Among the other reasons (besides the use of prior felony informations) why we try so few cases, a phenomenon I discuss further below, is that prosecutors commonly use Guidelines adjustments as bargaining chips in their efforts to settle cases. The seven proposed plea agreements Kupa received from the government contained various different "estimated" Guidelines ranges. The highest, set forth in the first one, was 360-life; the lowest, which was in proposed agreements four and five, was 110-137 months. The movable parts in those varying estimates included role adjustments ranging from +3 to -2, base offense levels ranging from 37 to 32, and a "global disposition" bonus of either -1 or -2 if all of the defendants pled guilty. All of Kupa's co-defendants engaged in similar Guidelines-factor bargaining.

[64] A prison sentence of 130 months would yield approximately 18 months of good time for a total of 112 months.

"acceptance of responsibility" level that the government had added to his previous agreement.[65] The upshot: the agreement provided for a recommended range of 140-175 months, an effective prison term of 10 years.[66]

So Kupa found himself in a difficult position as his trial approached. Looming in the background was the reality that if he went to trial and the jury convicted him, the law would require that he die in prison. And with each passing day the sentence the government was willing to recommend was creeping upward. If I were to sentence at the bottom end of the government's recommended range in the final proposed plea agreement, the five-week delay from March 5 to April 9, 2013 had already cost Kupa over two years in prison.

On April 10, 2013 Kupa finally caved and entered a plea of guilty. He told me at the time that he wanted to eliminate the potential downside of life in prison by pleading guilty.[67] Also, referring to the steady increases in the sentences recommended in the last three proposed plea agreements, he said, "I want to plead guilty, your Honor, before things get worse."[68] The voluntariness of a defendant's plea of guilty is an interesting issue when the cost of going to trial is three or more decades in prison. Nevertheless, I found Kupa's plea to be voluntary and accepted it.

The 140-175 month range was jointly recommended by the parties. For various reasons I have elaborated upon elsewhere, negotiated agreements like Kupa's are essentially

---

[65] Though the third level of downward adjustment for accepting responsibility is supposed to depend on the timeliness of a defendant's notice to the government of his intention to plead guilty, *see* U.S.S.G. § 3E1.1(b), in this case and others the third level appears and reappears in proposed plea agreements as a bargaining chip, that is, as a way to adjust the final estimated range. Thus, even though the trial date had remained stationary, the third level for acceptance of responsibility, which was missing from the proposed plea agreements dated March 1 and March 5, had been *added* to the one dated April 4 in order to reach the desired recommended range. All proposed plea agreements are on file with chambers.

[66] A prison sentence of 140 months would yield approximately 20 months of good time for a total of 120 months.

[67] April 10 Tr. at 37.

[68] *Id.* at 29.

23

sentence bargains.[69]  I saw no reason not to accept the bargain between the government and

Kupa.  Kupa will complete his 11-year sentence, taking into account good time, when he is about

45 years of age.[70]  Assuming he lives to the age of 75, his trial penalty would have been 30 years

in prison if he had proceeded to trial and the jury had found him guilty.

When it became clear to me on April 10, 2013, that Lulzim Kupa's plea of guilty

had been coerced by the threat of a mandatory life term if he insisted on going to trial, I informed

the Assistant United States Attorneys ("AUSAs") on the case of my belief that the United States

Attorney had agreed to refrain from using prior felony informations to coerce pleas after the

office's longstanding practice of doing so was brought to her attention in 2010.  In response, the

AUSAs wrote a letter stating as follows:

> [t]he Office's decision as to whether to file a prior felony
> information is based on an individualized assessment of numerous
> facts, including, but not limited to, the seriousness of the
> defendant's crimes, the defendant's role in those crimes, the
> duration of the crimes, whether the defendant used or threatened
> communities and society as a whole.  The decision as to whether to
> file a prior felony information is the subject of careful review and
> approval by the Office's supervisors and executive leadership.[71]

That sounds nice, but actions speak louder than words.  Whatever the result of the

"individualized assessment" with regard to Kupa, he was indisputably stuck with a prior felony

information – and a *life* sentence – only if he went to trial, and he was indisputably not stuck

with it only if he pled guilty.  Despite the government's patter, there was only one individualized

consideration that mattered in his case, and it was flat-out dispositive: Was Kupa insisting on a

---

[69]    *See* John Gleeson, *The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentence Bargains*, 36 HOFSTRA L. REV. 639 (2008); John Gleeson, *Sentence Bargaining Under the Guidelines*, 8 FED. SENT'G REP. 6 (1996).

[70]    I sentenced Kupa to 132 months, which yields approximately 19 months of good time for a total of 113 months (*i.e.*, 9 years and 5 months).  As I stated at the time of sentencing, there was reason to believe that some of the same conduct at issue in this case was considered by the judge who sentenced Kupa in 2006, so I felt it appropriate to sentence him slightly below the agreed-upon range.

[71]    Letter from Gov't to the Court re: *United States v. Kupa*, at 2, Apr. 12, 2013, ECF No. 179.

trial or not?  If he was, he would have to pay for a nonviolent drug offense with a mandatory life sentence, a sentence no one could reasonably argue was justified.

In defending its use of the prior felony information, the AUSAs' letter went on to identify the results of the individualized assessment in Kupa's case: He had a lengthy criminal history, and much of the conduct underlying his prior convictions occurred while Kupa was serving terms of supervised release.  Those facts supposedly triggered the filing of the prior felony information.[72]  But even though the government knew those facts a year earlier, it did not file a prior felony information until he refused to plead guilty a few weeks before trial.  And even though Kupa still had that criminal history when he showed up for sentencing, by then the prior felony information had been withdrawn.  Why?  Because he buckled under its pressure and agreed to forgo a trial.  That's all that mattered when it came to the prior felony information. The government's letter claiming that something else was going on revealed an uncharacteristic lack of candor.  The silver lining to the dissembling is that it suggests an understanding by the prosecutors in this district that the use to which the prior felony information was put in Kupa's case is not a proper one.

Not all prosecutors have that understanding.  Many believe that using harsh mandatory minimums to strongarm guilty pleas is their birthright.  In last month's hearing before the Senate Judiciary Committee, the Executive Director of the National District Attorneys Association testified as follows:

> While federal mandatory minimum sentences sometimes result in outcomes that seem harsh, the vast majority of those cases are the

---

[72]     *See id.* at 3.

result of a defendant that rejected plea negotiations [and] went to trial . . . .[73]

Though the power to file a prior felony information eventually produced the intended effect of squeezing Kupa into pleading guilty, it took longer in his case than in most cases. Indeed, one of the many problems associated with tracking the use of prior felony informations is defendants often plead guilty in response to the *threat* that one will be filed, producing an outcome that is very much the result of this prosecutorial power without any record of its use.[74] The Federal Defender for both the Southern and Eastern Districts of New York has described how it works as follows: "If the client has a prior qualifying conviction, and is considering trial or a motion, the prosecutors will threaten to file a 'prior felony information' that will double the mandatory minimum. Few clients have the stomach to push back against those threats (which are not idle)."[75]

Still, not all defendants buckle when prosecutors threaten to punish them for going to trial by filing prior felony informations. Some actually insist on their constitutional rights. In those circumstances, prosecutors believe they have little choice but to go ahead and file the prior felony informations. "Plea bargaining is what academics call a 'repeat-play' game; the same lawyers negotiate pleas again and again. A prosecutor who becomes known as a pushover will be taken advantage of, not once but many times."[76] That can't be allowed to

---

[73] *Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013) (statement of Scott Burns, Exec. Dir., Nat'l Dist. Attorneys Ass'n), *available at* http://www.judiciary.senate.gov/pdf/9-18-13BurnsTestimony.pdf (last visited Oct. 9, 2013).

[74] *See* Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. PA. L. REV. 79, 143 n. 200 (2005) (noting that one measure of a "prosecutor's power to create a guilty plea discount is the percentage of charges filed under statutes carrying mandatory minimum sentences" but leaving that measure out of the analysis because the discounting effect "can be achieved either by filing the charges and dismissing them later, or by threatening to file the charges").

[75] David E. Patton, *Federal Public Defense in an Age of Inquisition*, 122 YALE L.J. 2578, 2594 (2013); *see also Young*, 2013 WL 4399232, at *15 (observing, based on the remarks of an Assistant United States Attorney in a neighboring district, that prior felony informations are filed in the District of Nebraska only against defendants who go to trial).

[76] WILLIAM J. STUNTZ, THE COLLAPSE OF AMERICAN CRIMINAL JUSTICE 258 (2011).

happen, so those who call the prosecutors on their threat have to pay. Otherwise, as an Assistant United States Attorney in the District of Massachusetts has explained it, "you lose some credibility going forward."[77] As described below, the costs of maintaining prosecutorial credibility can be jarring.

2. *Using Prior Felony Informations to Punish Those Who Refuse to Plead Guilty – Tyquan Midyett*

Tyquan Midyett turned 26 years old during the period he participated in user-quantity sales of crack in the Marcy Houses here in Brooklyn. Midyett's life story is all too familiar – broken home, foster care, high school dropout, and a long history of substance abuse. He began using marijuana at age 14, and smoked four "blunts" a day until he was arrested in December 2007.[78]

Early in the case, the prosecutor sent Midyett a proposed plea agreement setting forth the government's version of the advisory Guidelines range.[79] Taking into account Midyett's minor role in the offense, the 100:1 cocaine to crack ratio then in effect, and Midyett's

---

[77] Transcript of Sentencing at 4, *United States v. Doutre*, 08-CR-10215 (D. Mass. Mar. 22, 2010), ECF No. 168. Prior to imposing sentence, the judge asked the prosecutor – whose prior felony information had triggered a mandatory life sentence – whether such a sentence would be "just." The prosecutor explained how justice can take a back seat to the government's credibility when a defendant is told he will face life without parole unless he pleads guilty and then he refuses:

> You know, what I would say, your Honor, is, I mean, there [were] extensive efforts to try to resolve this case prior to trial. And, you know, on some level, when you're a prosecutor and you're making concessions before trial and offering to make concessions that are declined, you know, you lose some credibility going forward if you then make those same concessions. So the defendant, you know, just as a – *this doesn't really address your question of justness*, but it gives you the background here in terms of why we are here now as opposed to this case getting resolved on a plea to a lesser sentence [than life].

*Id.* at 4-5 (emphasis added).

[78] These facts are drawn from the sentencing proceedings. Transcript of Sentencing at 36, *United States v. Midyett*, No. 07-CR-874 (KAM) (E.D.N.Y. June 17, 2010), ECF No. 515.

[79] These facts are drawn from a Memorandum and Order denying Midyett's *pro se* motion contending that the lawyer who failed to advise him to plead guilty was ineffective. Midyett claimed that his counsel had failed to properly advise him of the consequences of rejecting a guilty plea and proceeding to trial. *United States v. Midyett*, No. 97-CR-874, 2010 WL 447384, at *1 (E.D.N.Y. Feb. 2, 2010). The Court held an evidentiary hearing on October 28, 2009 to explore the circumstances of the plea discussions. *See id.*

prior conviction in state court for criminal sale of a controlled substance, the plea agreement stated his range would be 78-97 months in prison if he pled guilty. However, as the prosecutor pointed out in the cover letter to the proposed plea agreement, Midyett had been charged with a 10-life count, so even if he pled guilty the best he could do at sentencing was a ten-year prison term. The prosecutor offered to recommend that sentence to the court.

The offer to recommend a sentence almost three and a half years *above* the lower end of a Guidelines range computed under the much-maligned 100:1 regime didn't give Midyett much of an incentive to plead guilty. As the case approached trial, the prosecutor needed to make a plea of guilty more attractive to him. So he told Midyett's counsel that if Midyett didn't plead guilty by a specified date, the government would file a prior felony information, which would double the mandatory minimum to 20 years.

But Midyett still wanted to put the government to its proof. So that's what he did, and the government followed through with its threat by filing the prior felony information. The trial happened, Midyett was found guilty, and in June of 2010 another judge in this district sentenced him to the mandatory 20-year prison term.

Here's the recap on Midyett: He started out as one of the defendants that Lanny Breuer, the Chief of DOJ's Criminal Division, spoke of when he told Congress in April 2009 that crack sentences are fundamentally unfair and racially discriminatory.[80] According to DOJ itself, Midyett should have been sentenced on par with a similar offender who trafficked in powder cocaine. That would have reduced the estimated range in Midyett's plea agreement to 46-57 months. But the United States Attorney made any sentence below ten years legally impossible by bringing a 10-life count, conferring kingpin status on Midyett despite the government's own

---

[80]     *Restoring Fairness to Federal Sentencing*, *supra* note 2, at 4-6.

assertion in the proposed plea agreement that he played only a minor role in the crime.[81]  So the first charging decision added more than five years to what would have been a fair sentence *even according to DOJ*.  Then, after Midyett had the audacity to exercise his right to trial, the second charging decision – the filing of a prior felony information – cost him an additional ten years.  Twenty years in prison for a street-level dealer who committed a low-level drug offense involving what the sentencing judge found to be less than four ounces of crack.[82]

      3.      *The Abuse of the Power to File Prior Felony Informations is Widespread and Longstanding*

As mentioned above, it's difficult to gather data about the use of prior felony informations.  Because a prosecutor's oral threat to file one is often sufficient to prod a defendant into pleading guilty, there is usually no record of its role in the case.[83]  Still, there is plenty of documentary evidence that the use of prior felony informations to coerce pleas and inflict trial penalties is widespread, in this district and elsewhere.  It shows that there are different ways to use them as sledgehammers.  One is to withhold the filing of a prior information and threaten to file it if the guilty plea isn't forthcoming.[84]  Another is to just file one ahead of time and then, as

---

[81]      A post-verdict hearing revealed that the prosecutor refused to back off the ten-year mandatory minimum unless Midyett agreed to cooperate.  *Midyett*, 2010 WL 447384, at *2.  As I noted in *Dossie*, any discussion of the government's use of the drug offense mandatory minimums must take account of how central those provisions are to federal prosecutors' efforts to solicit cooperation.  *See* 851 F. Supp. 2d at 487-88 (noting that, although it is permissible to charge an otherwise deserved sentence when the defendant refuses to cooperate, it is altogether a different matter when an otherwise inappropriate and unjust sentence is threatened simply to coerce cooperation).

[82]      Transcript of Sentencing at 18, *Midyett*, No. 07-CR-874, *supra* note 78.

[83]      As an experienced district judge in the District of Colorado has observed, "How many times is a mandatory sentence used as a chip in order to coerce a plea?  They don't keep records . . . . That's what the public doesn't see, and where the statistics become meaningless."  Richard A. Oppel, Jr., *Sentencing Shift Gives New Leverage to Prosecutors*, N.Y. TIMES, Sept. 25, 2011, *available at* http://www.nytimes.com/2011/09/26/us/tough-sentences-help-prosecutors-push-for-plea-bargains.html?pagewanted=all&_r=0 (last visited Oct. 9, 2013) (quoting Judge John L. Kane Jr. and noting that he believes the use of mandatory sentences to coerce pleas is "very common"); *see also* Wright, *supra* note 74, at 143 n.200 (noting that one measure of a "prosecutor's power to create a guilty discount is the percentage of charges filed under statutes carrying mandatory minimum sentences" but leaving that measure out of the analysis because the discounting effect "can be achieved either by filing the charges and dismissing them later, or by threatening to file the charges").

[84]      A review of the dockets in this district revealed the following examples, among others.  In *United States v. Bolt*, 07-CR-127 (FB), the prosecutor informed the court as follows: "If the defendant proceeds to trial, the

the case gets close to trial, condition a promise to withdraw it on the defendant pleading guilty. The government's handling of three of Kupa's co-defendants showcased this latter technique.[85]

The use of prior felony informations to coerce guilty pleas is common around the country. The Sentencing Commission's 2011 report to Congress on mandatory minimums revealed that the vast majority of both prosecutors and defense attorneys reported that filing notices under § 851 was part of plea negotiations. The Commission visited thirteen districts, conducting interviews with defense attorneys and prosecutors.[86] The prosecutors in nine of those districts admitted that they "delayed filing the [§ 851] notice while engaging in plea

---

government will file a prior felony information." Letter in Opp. to Def.'s Mot. to Preclude Filing of Prior Felony Information, Feb. 28, 2009, ECF No. 77. The government filed the prior felony information four days before case was called for jury selection. Information to Establish Prior Conviction, Mar. 9, 2009, ECF No. 79.

    In *United States v. Hansen*, 07 CR 520 (JG), the government informed the Court as follows with regard to the filing of the prior felony information: "The government . . . spoke with defense counsel before filing the prior felony information on August 22, 2008 to confirm that the defendant did not intend to plead guilty. After defense counsel confirmed the defendant's decision to proceed to trial, the government filed the prior felony information in this case." Letter as to Basil Hanson, Dec. 9, 2008, ECF No. 86. The prior felony information was filed less than two weeks before the trial began. ECF No. 61.

    In *United States v. Blackwood*, 07 CR 168 (SLT), the government provided a plea agreement to the defendant on November 8, 2007 and warned that if not accepted before November 15, 2007, the government would file a prior felony information. *See* Letter, Nov. 8, 2007, ECF No. 94 ("[P]lease note that this plea offer will be withdrawn after the November 15 date and a prior felony information will be filed with the Court in anticipation of trial."). When the defendant did not accept the plea, the government filed the information one week before jury selection. After a three-day trial, the jury returned a guilty verdict, and the government argued that a twenty year sentence was appropriate. *See* Transcript of Sentencing, Oct. 9, 2012, ECF No. 218) ("If he declined to plead guilty before the prior felony information was filed, which is his right, and he was given a fair trial by Your Honor and the jury, then there is nothing in the law anywhere in this country that says that those statutory laws enacted by Congress are somehow defective or that they don't apply."); *see also United States v. Faison*, 07 CR 700 (SJF), Mot. to be Relieved as Counsel, Nov. 14, 2007, ECF No. 34 (government filed the prior felony information on the day of jury selection); *United States v. Aybar*, 08 CR 876 (JG), ECF No. 113 (same); *United States v. Murph*, 08 CR 322 (LDW), ECF Nos. 61, 161, 239 (prior felony information filed on December 22, 2008; trial commenced on January 12, 2009).

    [85] On September 7, 2011 Neil Lombardo, Joseph Sclafani and Afrim Kupa were indicted on the same 10-life cocaine trafficking charge in which Lulzim Kupa (Afrim's brother) was named. On December 30, 2011 a prior felony information was filed with respect to Lombardo, Sclafani and Afrim Kupa, which converted their 10-life count into a 20-life count. All three were given the benefit of a government withdrawal of the prior felony information (and a government recommendation of a sentence substantially below the 20-year mandatory minimum) on the condition that they plead guilty. Rather than face a certain 20-year term, they all succumbed and pled guilty. Lombardo was sentenced on August 27, 2013 to a 14-year term in prison; Sclafani was sentenced that same day to a 15-year term; and Afrim Kupa was sentenced on September 13, 2013 to an 11-year term. The government told all three that the only way they could avoid the 20-year mandatory sentence they'd have faced if convicted at trial was by pleading guilty.

    [86] MANDATORY MINIMUM REPORT, *supra* note 8, at 112.

negotiations;" in "many" of those districts, defense attorneys described the delay as a "threat" to "coerce" a plea.[87]

As mentioned above, the use of prior felony informations is often invisible, but on occasion it is captured by a document in a case. Sometimes the court of appeals will make reference to it in an opinion.[88] Sometimes there will be reference to it in a brief on appeal[89] or in a letter to the district court.[90] Sometimes the proposed plea agreements themselves make the

---

[87] *Id.*

[88] *See, e.g.*, *United States v. Dotson*, 513 F. App'x 221, 223 (3d Cir. 2013) (noting that the government agreed to "withdraw one of the convictions from the [prior felony] information to reduce Dotson's sentencing exposure from a mandatory life sentence to a mandatory minimum sentence of twenty years' imprisonment"); *Gilbert v. United* States, 640 F.3d 1293, 1298 (6th Cir. 2011) (observing the "non-application of [the prior felony information] obviously was part of the [plea] agreement"); *United States v. Espinal*, 634 F.3d 655, 659 (2d Cir. 2011) (describing that, in 2006, the government advised the defendant that, "if he did not plead guilty by September 15, it would file a prior felony information . . . . Filing such an information would, among other things, enhance the applicable mandatory minimum sentence from ten years in prison to twenty."); *United States v. Shaw*, 426 F. App'x 810, 812 (11th Cir. 2011) (describing how the prosecutor informed the defendant that, "if [he] went forward with the suppression hearing, [the prosecutor] would file the § 851 notice seeking the mandatory-minimum life sentence"); *United States v. Harris*, 394 F. App'x 676, 679-680 (11th Cir. 2010) (mentioning that the government agreed to withdraw the notice of two prior felonies – thereby taking a mandatory life sentence off the table – only if the defendant pleaded guilty); *United States v. Forrester*, 616 F.3d 929 (9th Cir. 2010) (referencing how, five days before trial, the government "extended a plea offer . . . [and] told [the defendant] that if both he and [his co-defendant] accepted the 'package deal,' [the defendant] could limit his exposure to 20 years. The government stated that if the plea offer was not accepted by 2:00 pm that same day, it would file a sentence enhancement pursuant to 21 U.S.C. § 851. The offer was not accepted by either [defendant] . . . and the government filed the § 851 enhancement."); *Coleman v. United States*, 339 F. App'x 643 (7th Cir. 2009) (denying a 28 U.S.C. § 2255 motion for ineffective of counsel; the attorney had advised the defendant that the government would file a prior felony information unless he pleaded guilty); *United States v. Jenkins*, 537 F.3d 1, 4 (1st Cir. 2008) (no presumption of prosecutorial vindictiveness where government decided to file a prior felony information because the defendant refused to plead guilty); *Vadas v. United States*, 527 F.3d 16, 19 (2d Cir. 2007) (observing that the written plea agreement with the U.S. Attorney for the District of Connecticut provided that, "[i]n exchange for the plea, … [t]he government also agrees to withdraw the Amended Second Notice Information filed March 15, 2001 pursuant to . . . Section 851.") (emphasis in original).

[89] *See* Brief of Appellee United States of America, at 5, *United States* v. *Pacheco*, 512 F. App'x 112 (2d Cir. 2013) (No. 12-CR-655), 2012 WL 5839262 ("During the pretrial period the government and Pacheco engaged in plea discussions. The government made a series of plea offers, each of which permitted Pacheco to plead guilty to the one-count indictment without the filing of a penalty enhancement. The government informed Pacheco that it would file a § 851 information, increasing his mandatory minimum from ten to 20 years, if Pacheco did not plead guilty. Pacheco negotiated with the government, but rejected the government's offers. On August 11, 2011, the government filed the enhancement, notifying defendant and the district court that the government would rely on one of defendant's two prior felony narcotics convictions at sentencing if a jury convicted Pacheco. The government could have relied on both convictions to elevate the mandatory minimum to life imprisonment, but did not do so.").

[90] *See, e.g.*, Letter from Defense Counsel, at 1, May 6, 2012, *United States v. Martinez*, 11-CR-1060 (KMW) (S.D.N.Y.), ECF No. 8 (letter to Judge Kimba Wood explaining that government was offering misdemeanor to defendant charged with felony drug trafficking in exchange for a guilty plea, but that the government would file a prior felony information if the defendant rejected the offer).

*quid pro quo* explicit, although those agreements are usually not on file with the court.[91]  More

recently, the Supreme Court cases that extended the Sixth Amendment right to the effective

assistance of counsel into the plea bargaining stage of a case[92] have caused prosecutors to make a

record of the fact that the defendant turned down a chance to avoid the doubling of the

mandatory minimum by insisting on a trial.[93]

       In addition to being widespread, the use of prior felony informations to coerce

pleas of guilty is longstanding.  A prominent member of the academy who once served as a

federal prosecutor in the Southern District of New York described his office's practice of using

the power to file a prior felony information as a "sledgehammer" to coerce guilty pleas as

follows:

> As a federal prosecutor in the U.S. Attorney's Office for the Southern
> District of New York, I learned and implemented the unwritten policy
> that . . . we were never to file prior felony informations against
> defendants who timely pleaded guilty but were always to file these
> informations several weeks before trial.  As I understood it, this policy
> applied even when a defendant pleaded guilty to certain counts of an
> indictment (such as base offenses), so long as the defendant was
> insisting on a trial on one or more counts (such as enhanced offenses)
> that were subject to prior felony informations.

---

[91]    It appears, for example, that in the Western District of Oklahoma, it is part of the standard plea
that the government will file the prior felony information unless the defendant pleads guilty.  *See, e.g.*, Plea
Agreement ¶ 15, *United States v. Bell*, 08-CR-303 (W.D. Okla. Jan. 12, 2009), ECF No. 22 ("If defendant enters a
plea of guilty as described above and fully meets all obligations under this agreement, then the United States
Attorney's Office for the Western  District of Oklahoma will not file an information pursuant to Title 21, United
States Code,  § 85l to establish any prior convictions."); *see also* Letter from AUSA to Defense Counsel, Nov. 7,
2007, *United States v. Winston*, 07-CR-801 (RMB) (S.D.N.Y.) ("In further consideration of the defendant's plea, the
government will not file a prior felony information) (letter on file with chambers.").

[92]    *See Missouri v. Frye*, 132 S.Ct. 1399 (2012); *Lafler v. Cooper*, 132 S.Ct. 1376 (2012).

[93]    *See* Transcript of Calendar Call at 3-4, *United States v. Dames*, No. 11-CR-20796 (S.D. Fla. May
2, 2012) (AUSA: "[I]n light of *Lafler* and *Frye*, I would just like to place on the record the plea [offer] that is
outstanding at this time. . . .  [T]he defendant could plead to Count 4 of this indictment and the government will
grant him acceptance of responsibility . . . at least to the two points, and he could be facing a guideline range of 78
to 97 months.  The defendant is – he has the possibility of having an 851 enhancement filed against him.  It's the
government's intention to file that enhancement, should this case go to trial [as scheduled on May 7].  Specifically,
the government will file that enhancement at 5 o'clock on this Friday, May 4th. . . .  That means that Mr. Dames
would be facing a mandatory minimum sentence of 120 months . . . .).

. . .

> One could ask, if prosecutors have such powers under current law, why do they not use them to extract as much prison time as possible out of defendants? Why is the gulf between trial and plea numbers so vast? . . . The answer is that the prior felony information is a sledgehammer, not a scalpel. The amount of time involved is so large and packaged in such discrete chunks (ten years, twenty years, or life) that it cannot be parceled out. . . . Thus, the prior felony information is a powerful deterrent to trial but cannot be used more subtly to influence the terms of the plea.[94]

Similarly, another former prosecutor in that office, who later became a sentencing judge in that district and now sits on the Court of Appeals for the Second Circuit, wrote about the first sentence he imposed as follows:

> I shouldn't keep you in suspense any longer about the actual sentence. Of course, there is only the most modest suspense anyway for those readers familiar with federal sentencing. The amount of cocaine attributable to Eddie exceeds five hundred grams, and so he is subject to a mandatory minimum sentence of five years (and a maximum of forty, well beyond his life expectancy). As a prior narcotics offender, moreover, if the government chooses to file a prior felony information, the mandatory minimum is doubled to ten years . . . . The only suspense is whether the government chose to file the information, but experienced practitioners will be in little doubt about the answer. Perhaps if Eddie had pled guilty, the prosecutor might have been willing to forego the filing in order to secure a certain conviction. But Eddie went to trial. Enough said: no mercy.[95]

E.    *Judicial Reaction to the Abuse of Prior Felony Informations*

---

[94] *See* Stephanos Bibas, *Judicial Fact-Finding and Sentence Enhancements in a World of Guilty Pleas*, 110 YALE L.J. 1097, 1153 n.342 (2001). The one exception Professor Bibas noted, which is consistent with my observations, is the filing of prior felony informations against defendants who are also cooperating witnesses. In that setting, the prior felony information is intended to make the witness appear more credible to the juries before whom they testify. Such defendants almost always receive motions pursuant to 18 U.S.C. §3553(e) as part of their bargains with the government, however, so they do not feel the sentencing brunt of the prior felony informations. *See id.* ("Prosecutors also file prior felony informations against defendants cooperating in the prosecution of other individuals. These informations give the prosecution added leverage and thereby ensure continued truthfulness and cooperation. If the cooperator remains cooperative, however, the prosecution then files a motion pursuant to 18 U.S.C. § 3553(e) (1994). This motion gives the court the power to impose a sentence below the statutory minimum as a reward for cooperation and so counteracts the prior felony information.").

[95] Lynch, *supra* note 11, at 556 n.17 (certain footnotes omitted).

Judicial frustration with the use of prior felony informations is as widespread and as longstanding as the practice itself.  In *United States v. Doutre*, a prior felony information was filed early in the case.[96]  The underlying convictions were based on the distribution of $50 worth of drugs (giving rise to a conviction in Massachusetts state court) and the simple possession of drugs (giving rise to a New Hampshire conviction that nonetheless qualified as a "felony drug offense" under § 851).[97]  On several occasions, including on the morning of jury selection, the prosecutor offered Doutre a plea bargain that, if accepted, would have resulted in a withdrawal of the prior felony information and a 14-year prison term.[98]  But as set forth in footnote [ ], once Doutre exercised his right to trial, the prosecutor felt he had to follow through on his threat to file the prior felony information.  After all, his credibility was on the line.

Still, the sentencing judge tried to find a middle ground: maybe the government might settle for just one bump-up, *i.e.,* the 20-year mandatory minimum, rather than insisting on mandatory life.  "I worry because I think that the U.S. Attorney's office has a huge amount of discretion in charging 851s," she said.[99]  She then asked the AUSA, "You want to stick with the two 851s?"[100]  When the AUSA answered in the affirmative, the judge sentenced Doutre to life in prison, as the statute required.[101]  As she did so, she summed up the problem with giving prosecutors the authority to mandate draconian sentences: "I used to be a state court judge, and I've imposed a life sentence six times, and it was for a murder each time.  I've never imposed before a life sentence for a drug offense . . . .  I worry that this is an unjust sentence.  Life is what

---

[96]     Information to Establish Prior Conviction, *United States v. Doutre*, No. 08-CR-10215 (PBS) (D. Mass. Sept. 15, 2008), ECF No. 20.  This case is also referenced above.  *See supra* note 77.  The facts set forth here regarding Doutre are gleaned from the court filings in this case.

[97]     Transcript of Sentencing at 11, *Doutre*, No. 08-CR-10215, *supra* note 77.

[98]     Aff. of Trial Counsel ¶ 5, *Doutre*, No. 08-CR-10215 (D. Mass. July 23, 2013), ECF No. 214.

[99]     Transcript of Sentencing at 13, *United States v. Doutre*, *supra* note 77.

[100]     *Id.* at 14.

[101]     *Id.*

happens when you murder someone."[102]  Doutre, who is 32 years old, is presently serving life at the United States Penitentiary in Lewisburg, Pennsylvania.[103]

Prosecutors don't just use prior felony informations to try to fend off trials.  A case from earlier this year in the Eastern District of Missouri illustrates that even after that fails, they sometimes use them to try to fend off appeals.  Dennis Capps is a 39-year old methamphetamine addict.  Eleven years before his involvement in the case that resulted in his sentencing on January 22, 2013, Capps pled guilty to trafficking in "an amount of drugs that you can hold in your hand."[104]  After that case, Capps rebounded, becoming what the sentencing judge described as a "model prisoner on probation" who "showed the ability to conquer his substance abuse for a lengthy period."[105]  But he relapsed, as substance abusers often do, and that led to his involvement in the events giving rise to a 10-life methamphetamine charge.[106]  Unfortunately for Capps, his old guilty plea covered two separate charges based on events that occurred a month apart.  Each one independently constituted a "prior drug felony" for the purposes of § 851.

Since Capps put the government to its proof at trial, he had to pay with more than just a 10-life count.  A prior felony information was filed, converting a case in which the harsh guidelines for methamphetamine offenses[107] recommended a sentence of 235-293 months into a mandatory life sentence.[108]  The sentencing judge expressed her frustration as follows:

---

[102]     *Id.* at 13.
[103]     *Inmate Locator*, FEDERAL BUREAU OF PRISONS, http://www.bop.gov/iloc2/LocateInmate.jsp (enter Charles Doutre under "Search by Name").
[104]     Transcript of Sentencing at 31, *United States v. Capps*, 11-CR-108 (AGF) (E.D. Missouri Jan. 22, 2013), ECF No. 105.
[105]     *Id.* at 54-55.
[106]     *Id*. at 41-42.
[107]     *See, e.g*., *United States v. Hayes*, No. 12-CR-4040, 2013 WL 2468038, at *2 (N.D. Iowa June 7, 2013) (expressing a policy disagreement with the Guidelines for methamphetamine offenses).
[108]     Transcript of Sentencing at 14, *Capps*, 11-CR-108, *supra* note 104.

I have troubled over this case for quite some time. It is a difficult matter. It is difficult to impose a sentence of life with respect to an individual as young as you.[109] It is difficult to impose a sentence of life with respect to somebody who is impacted by substance abuse, somebody who has developed an addiction. It is difficult to impose a sentence of life with respect to an individual who was a model prisoner on probation and showed the ability to conquer his substance abuse for a lengthy period – for a number of years. It is very difficult. Were I a member of Congress I would not vote to impose this mandatory minimum sentence. It is not the judgment that I would make. I don't think that a mandatory minimum sentence of life here makes a whole lot of sense . . . . I think it is an unwise judgment on Congress' part . . . .[110]

The government's desire to bargain over decades-long chunks of Capps's life did not end when he refused to plead guilty. No doubt recognizing the injustice of its cruel insistence that Capps die in prison, the government decided to cut him some slack on the day of sentencing. But naturally it had to get something in return or it would look foolish, so on that day the prosecutor proposed a deal: if Capps would walk away from his *appeal*, the government would agree to a sentence bargain of 25 years. Capps turned it down, stating, "I don't feel like the 25 years is worth giving up all my appeal right . . . . It's still 25 years."[111] The early returns suggest that Capps bet wrong: the Eighth Circuit affirmed his conviction and sentence on June 11, 2013.[112]

Assuming Capps lives to be 75 years old and that the sentencing court would have sentenced him at the bottom of the Guidelines range if he pled guilty, it cost him about 25 years in prison to go to trial.[113] Assuming the same life expectancy, it cost him about 16 years in prison to pursue his short-lived appeal.[114]

---

[109] Capps is currently 39 years old.

[110] Transcript of Sentencing 54-55, *Capps*, 11-CR-108, *supra* note 104.

[111] *Id.* at 10.

[112] *United States v. Capps*, 716 F.3d 494, 498-99 (8th Cir. 2013) (holding that the sentence did not violate the Eighth Amendment).

[113] With a three-level adjustment for acceptance of responsibility, the sentencing range calculated by the court would have been 168-210 months. If Capps was sentenced at the bottom end of the range, his sentence

Even the truly egregious miscarriages of justice are too numerous to catalog here, but a few more examples may help to place the duration and depth of the problem in clearer relief.

Kenneth Harvey came along quite early in the era of excessive severity. He was 24 years old in 1989, when he committed the crack cocaine offense that resulted in a 10-life charge in the Western District of Missouri. He had two priors that qualified as felony drug convictions even though, as his sentencing judge put it, they "were not deemed serious enough to merit imprisonment and appear to be only technically within the statutory punishment plan."[115] He went to trial and lost, and because the government filed a prior felony information listing both convictions, Harvey got life for selling drugs with a wholesale value of less than $10,000.[116]

The sentencing judge noted that bank robbers with much more serious records generally served less than ten years in prison, and that the consequences of prior felony informations were "troubl[ing]" and were likely not "fully understood or intended by Congress in cases of this nature."[117] In light of that, and of Harvey's "immaturity of judgment," the sentencing judge imposed the mandatory life sentence but explicitly recommended executive clemency after 15 years, a recommendation the Eighth Circuit, in an opinion by the highly-regarded Judge Richard Arnold, endorsed.[118]

---

would yield approximately 24 months of good time, resulting in a sentence of 144 months. Capps would have completed his sentence at 51 years of age.

[114] Applying good time, Capps would serve just over 20 years on a 25-year sentence, completing his sentence at age 59. *See id.*

[115] Transcript of Sentencing, at 14, *United States v. Harvey*, No. 90-CR-6 (W.D. Mo.) (on file with chambers).

[116] *Id.* at 19.

[117] *Id.* at 18-19.

[118] *United States v. Harvey*, 946 F.2d 1375, 1378-79 (8th Cir. 1991).

The clemency recommendation turned out to be cold comfort to Harvey. The moribund clemency process is not the safety valve it used to be.[119] Today Kenneth Harvey is 48, well past the point when he should have received clemency, and his request for it has been denied.[120] He is more than 20 years into his life sentence for a low-level, nonviolent drug trafficking crime.

Melissa Ross's boyfriend got arrested for conspiring to distribute cocaine and crack. After his arrest, she assisted by housing fugitives, collecting money, and distributing drugs, leading to a 10-life conspiracy charge against Ross. Right off the bat, the government, "recognizing that [Ross] was a minor participant in [the] conspiracy," offered to withdraw the 10-life count if she would plead guilty to misprision of a felony and serve a three-year prison sentence.[121] She refused, and as the sentencing judge described it, the prosecutor "vindictively filed the § 851 enhancement because [Ross] asserted her constitutional right to trial by jury."[122] As a result, the drug dealer's girlfriend – the federal courts' paradigmatic minor player – is now doing 20 years instead of the three the government initially proposed. Consider these words of frustration expressed by the sentencing judge just this past summer:

> Prosecutorial discretion is a bedrock of the American criminal justice system. It takes on even greater importance when Congress limits judicial discretion through statutory minimum sentences. The § 851 enhancement should be used to protect the public from those defendants with a serious history of felony drug offenses, not as a cudgel to force minor participants like [Ross] to accept a plea.[123]

---

[119]    *See* Editorial, *Pardon Rates Remain Low*, N.Y. TIMES, Aug. 21, 2013, *available at* http://www.nytimes.com/2013/08/22/opinion/what-happened-to-clemency.html?_r=0 (last visited Oct. 9, 2013) ("To call it a lottery is unfair to lotteries; at least if you pick the right numbers, you're guaranteed to win.").

[120]    *See* John Tierney, *Life Without Parole: Four Inmates' Stories*, N.Y. TIMES, Dec. 12, 2012, *available at* http://www.nytimes.com/2012/12/12/science/life-without-parole-four-inmates-stories.html?_r=0 (last visited Oct. 9, 2013).

[121]    Order at 9, *Melissa Ross v. United States*, No. 03-CV-729 (M.D. Fl. July 11, 2013), ECF No. 40.

[122]    *Id.*

[123]    *Id.*

*Harvey* and *Ross* are bookends in a way; at the time of the Eighth Circuit's *Harvey* opinion the era of severity was in its infancy, whereas the quoted language in *Ross* was written just three months ago. In between are countless similar examples, and the same thread of judicial frustration runs through all of them. And as tempting as it is to make the point by focusing on the many mandatory life and mandatory 20-year sentences, the truth is that tangible injustices that should shame us all frequently happen on a smaller scale, which unfortunately makes them easier to overlook. In *United States v. Wahl*, for example, the prior felony information had the relatively minor effect of doubling the five-year mandatory minimum.[124] In an era where so many sentences are decades too long and too often require nonviolent drug trafficking defendants to die in prison, a measly five more years for a drug trafficker on his second conviction may seem from the outside like a minor problem or no problem at all. But in reality it is a huge problem. Judging is removed, prosecutors become sentencers, drug addicts are warehoused instead of treated,[125] prisons swell beyond their capacities,[126] enormous unnecessary costs are incurred,[127] futures and families and communities are ruined.[128]

The sentencing judge in *Wahl* touched most of those bases in a single case. Upon imposing the ten-year sentence required by the prosecutor's filing of a prior felony information, he stated as follows:

---

[124]      *United States v. Wahl*, 12-CR-167 (M.D. Fl.).
[125]      *See Leitch*, 2013 WL 753445, at *10-11.
[126]      *See id.* at *1; *Diaz*, 2013 WL 322243, at *10-11.
[127]      *See Leitch*, 2013 WL 753445, at *10-11; *Diaz*, 2013 WL 322243, at *10-11.
[128]      *See* Eric H. Holder, Jr., Att'y Gen. of the United States, Keynote Address at the Vera Institute of Justice (July 9, 2009), *available at* http://www.justice.gov/ag/speeches/2009/ag-speech-090709.html (last visited Sept. 10, 2013) ("One specific area where I think we can do a much better job by looking beyond incarceration is in the way we deal with non-violent drug offenses. We know that people convicted of drug possession or the sales of small amounts of drugs comprise a significant portion of the prison population. Indeed, in my thirty years of law enforcement, I have seen far too many young people lose their claim to a future by committing non-violent drug crimes.").

I have no discretion here. Whether that's good policy or bad is . . . something that I wish Congress would address.

When it comes to these charging decisions, in many cases a line prosecutor . . . has more authority than I do because he's the one that charges these offenses and that drives these mandatory minimums and I'm just a figurehead up here. I'm just a rubber stamp. I'm not sure why they pay me as much as they do to engage in this fiasco because I can't imagine if you got 20 educated people in a room and looked at this situation that one out of 20 would give this young man 10 years in prison. . . . I don't think it's fair or appropriate. . . . So I wish somebody would talk about changing the law. . . . I think the last figures I read, over 55 percent of all federal inmates are there on drug related charges. The vast majority of these people are not violent. They're not engaged in high-level trafficking. They're people who have addiction problems . . . . [T]o the extent that we're spending fortunes now warehousing people like Mr. Wahl for growing marijuana plants is patently ridiculous in my view, but I am not Congress.[129]

On rare occasions judges do something about the coercive use of prior felony informations. In *United States v. Jones*, the defendant was arrested after "a controlled buy on April 8, 2008 of over 100 grams of crack cocaine."[130] Her involvement in the offense, according to the government, was "minimal."[131] Jones had an eight-year-old conviction in state court for possession of a controlled substance, which qualified as a "felony drug offense" under § 851.[132] At the outset the government was tough as nails, and it looked grim for Jones. The prosecutor had charged a 10-life count based on the amount of crack involved in the offense, and had

---

[129] Transcript of Sentencing at 12-13, *Wahl*, No. 12-CR- 167 (M.D. Fl. Jan. 14, 2013); *see also* Transcript of Sentencing at 15, *United States v. Chester*, No. 92-122-CR-T-25B (M.D. Fla. Feb. 11, 1994) (containing statement from court in sentencing defendant whose Guidelines range was 235-293 months and whose two prior convictions resulted in no prison time to mandatory life: "This man doesn't deserve a life sentence, and there is no way that I can legally keep from giving it to him.").

[130] Gov't Sentencing Mem. at 2, *United States v. Jones*, 08-CR-887 (MHP) (N.D. Cal. Apr. 29, 2010), ECF No. 206. The facts set forth here regarding Jones are gleaned from the court filings in the case.

[131] *Id.*

[132] *United States v. Jones*, No. 08-CR-887, 2009 WL 2912535, at *1 (N.D. Cal. Sept. 9, 2009) (noting that Jones's conviction dated from September 8, 2000 for a violation of California Health and Safety Code section 11350(a), which prohibits possession of a controlled substance); *see also id.* at n.1 (noting that this conviction was for a personal use amount and was diverted by the Superior Court, which never imposed sentence) (citation omitted).

informed Jones by letter that she could avoid the filing of a prior felony information and the resulting 20-year mandatory minimum only if "she agreed to (1) submit to pretrial detention and not seek pretrial release at any time; (2) decline to litigate the case in any way or bring any motion to compel discovery, suppress evidence, or dismiss the indictment; and (3) plead guilty."[133] Six days later the prosecutor further demanded that Jones make a cooperation proffer.[134] Jones failed to meet all of those demands, and the prosecutor filed the prior felony information on April 17, 2009.[135]

Jones moved to strike the prior felony information on due process grounds, contending that it amounted to prosecutorial vindictiveness in violation of due process.[136] The government argued that *Bordenkircher v. Hayes* authorized its conduct.[137] The judge agreed, rejecting the vindictiveness claim, but she nonetheless held that the government's "ultimatum required that the defendant forfeit the procedural rights that the [Supreme] Court characterized as integral to our criminal justice system," and therefore violated due process.[138] It accordingly granted the motion to strike the prior felony information.[139]

What a difference a judge makes: Once the judge removed the prior felony information from the picture, the same prosecutor who tried to saddle Jones with a mandatory 20-year sentence asked the court to sentence her to *probation*.[140]

---

[133] Decl. of Ethan A. Balogh, ¶ 6 & Ex. B., *Jones*, 08-CR-887 (N.D. Cal. June 12, 2009), ECF No. 54 (referring to a March 13, 2009 letter from the government indicating that "the government is willing to forego the filing of an 851 information so long as the . . . . conditions are met.").

[134] *See id.* at Ex. C.

[135] *Id.* ¶¶ 14-17.

[136] Motion to Strike Information, *Jones*, 08-CR-887 (N.D. Cal. June 12, 2009), ECF No. 50.

[137] United States's Opp. to Motion to Strike 851 Information at 5-6, *Jones*, 08-CR-887 (N.D. Cal. June 29, 2009), ECF No. 65.

[138] *Jones,* 2009 WL 2912535, at *7.

[139] *Id.* The government subsequently asked the court to amend the memorandum and order granting that relief to make clear that the AUSA on the case was merely following office policy by filing the prior felony information. United States's Motion and [Proposed] Order to Amend the Court's Sept. 9, 2009 Memorandum and Order, *Jones*, No. 08-CR-0887 (N.D. Cal. Sept. 11, 2009), ECF No. 113.

[140] Gov't Sentencing Memorandum at 2, *Jones*, No. 08-CR-887, *supra* note 130.

If it seems heavy-handed and abusive to use the threat of a 20-year prison term to try to coerce a defendant who deserves probation to refrain from asking for bail, to forfeit all of her pretrial rights, to plead guilty, and to cooperate, that's because it is. That a federal prosecutor would do so openly and apparently shamelessly has everything to do with the history described above. Indeed, that history is critical to an understanding of how Jones's prosecutor actually believed he was doing her a *favor*:

> [The AUSA]: I mean, the government's goal here, as is plain from the papers, was to obtain Ms. Jones' cooperation. And I made clear to [defense counsel] from the beginning that . . . if she was not prepared to cooperate that we would file the 851 Information.
>
> . . .
>
> There is no constitutional impermissibility about [filing the prior felony information in response to the defendant's refusal to cooperate and her insistence on a trial] because the Government could have done it at the beginning, instead [we] made the decision to try and give the defendant an even bigger break [*i.e.*, by allowing her to cooperate].[141]

In other words, when an AUSA has been trained to believe that prior felony informations are to be automatically filed, anything short of automatic filing strikes that AUSA as an act of benevolence.

In *United States v. Taliaferro*, the sentencing judge called the government out on its heavyhanded tactics.[142] Taliaferro was another familiar, sad story – a history of family abuse; poor educational opportunities; early motherhood; and a series of arrests and convictions for

---

[141]   Transcript of Proceedings at 15, 23, *Jones*, No. 08-CR-887 (N.D. Cal. July 29, 2009), ECF No. 138.

[142]   *United States v. Taliaferro*, No. 08-CR-7 (D.N.H.).

misdemeanors and a felony drug conviction at the age of 18.[143]  At the age of 31 she was charged

with a 10-life count based on a crack sale.  During the almost two-year period of detention

pending trial, she was "a model inmate," who "worked diligently" and "completed [a] difficult

and valuable behavioral drug treatment program . . ., as well as vocational programs, anger

management programs and parenting programs."[144]

The government tried to leverage its power to mandate a 20-year sentence (by

filing a prior felony information) into a 15-year sentence bargain under Rule 11(c)(1)(C) of the

Federal Rules of Criminal Procedure.  Taliaferro reluctantly agreed, as the case against her was

apparently quite strong.  The judge discussed with her lawyer the reality of the situation:

> THE COURT: Well, your discomfort arises with the fact the prosecutor is sentencing.
>
> DEFENSE: I'm sorry?
>
> THE COURT: Your discomfort arises from the fact that it is the prosecutor who is sentencing.
>
> DEFENSE: I'm not sure I get your point.
>
> THE COURT: You either do 20 or you do 15.
>
> DEFENSE: Right.
>
> THE COURT: It's not me who is sentencing.[145]

The judge asked the prosecutor what would happen if he rejected the 15-year

sentence bargain.  The prosecutor answered that the government would withdraw the plea offer,

---

[143]     These facts are drawn from the sentencing proceedings.  Transcript of Sentencing, *Taliaferro*, No. 08-CR-7 (D.N.H. Feb. 17, 2010), ECF No. 58; Amended Transcript of Sentencing, *Taliaferro*, No. 08-CR-7 (D.N.H. Aug. 19, 2009), ECF No. 43.

[144]     Transcript of Sentencing at 7, *Taliaferro*, No. 08-CR-7 (D.N.H. Feb. 17, 2010), ECF No. 58.

[145]     Amended Transcript of Sentencing at 6, *Taliaferro*, No. 08-CR-7 (D.N.H. Sept. 14, 2009), ECF No. 43.

as it is entitled to do under Rule 11, and file the prior felony information, thereby mandating a 20-year sentence if Taliaferro were convicted at trial. The judge, determined to do justice, rejected the 15-year plea bargain and, over the government's objection, simply imposed the 10-year mandatory minimum Taliaferro was originally charged with.[146]

F.      *The Damage Caused by the Government's Use of Prior Felony Informations*

We like it when defendants admit their guilt. It spares the government and the courts the high cost of trials. And even putting cost-effectiveness aside, an admission of guilt is the first step on the road back to a law-abiding, productive life. So one might ask: what's wrong with a statutory regime that is very effective in getting drug trafficking defendants to plead guilty? Actually, there's a lot wrong with it.

First, it results in the imposition of excessive sentences. No one can reasonably argue that Tyquan Midyett's or Melissa Ross's 20-year prison term was fair. No one can reasonably argue that Charles Doutre, Dennis Capps, or Kenneth Harvey deserved life in prison. No one, not even the government, wanted those defendants to receive their sentences. The only reason prior felony informations were used against them was because the government unsuccessfully tried to coerce them to plead guilty.[147] And because other defendants have to know that the government isn't kidding when it threatens to use prior felony informations against those who have the audacity to go to trial, they became examples. Their sentences may be a natural result of the way prosecutors routinely deploy prior felony informations, and as discussed above there are numerous others just like them warehoused in our prisons.[148] But the fact that

---

[146]      Transcript of Sentencing at 18, *Taliaferro*, No. 08-CR-7, *supra* note 143.

[147]      STUNTZ, *supra* note 76, at 259 (recidivism-based enhancements and other similar laws have "granted prosecutors the power to threaten sentences that neither the enacting legislators not the prosecutors themselves sought to apply, all as a means of inducing guilty pleas with prosecutors' preferred sentences attached.").

[148]      In *United States v. Strickland*, 05-CR-80746 (GER) (E.D. Mich), Strickland was indicted in 2005 on a 10-life count. The government offered him a plea that would result in a 10-year sentence. When Strickland rejected the plea, the government filed a prior felony information giving notice of two state court convictions dating

they are business as usual doesn't alter the fact that these sentences should instill shame in all of us. If Midyett had instead been prosecuted in the state court across the street from our courthouse, he would certainly have avoided a 20-year prison term and might have avoided a conviction altogether.[149] Instead, to borrow the words of the Attorney General, Midyett's "claim to a future has been taken from" him at enormous expense to him, his family and the public.[150]

---

from 1990 and 2000 for possession of less than 25 grams of cocaine; Strickland had been sentenced to probation for each offense. Knowing that Strickland faced mandatory life if convicted, the judge – having seen the evidence – tried to persuade him to accept the government's offer. *See* Transcript of Sentencing at 16, *Strickland*, 05-CR-80746 (E.D. Mich. Oct. 24, 2007), ECF No. 72. However, Strickland maintained his innocence and insisted on going to trial. He was convicted, and on the day before his 34th birthday he was sentenced to a mandatory term of life imprisonment. *See also United States v. Strickland*, 342 F. App'x 103 (6th Cir. 2009) (affirming the conviction).

     In *United States v. DeJohn*, 05-CR-347 (NAM) (N.D.N.Y.), the defendant was indicted in 2005 on a 10-life marijuana charge. A few weeks after the indictment, the government filed a notice of one prior drug felony. Information to Establish Prior Conviction, *DeJohn*, 05-CR-347 (N.D.N.Y. August 29, 2005), ECF No. 124. DeJohn refused to plead guilty, and three weeks before jury selection (and over a year after the first prior felony information), the government filed a second prior felony information, giving notice that DeJohn had been convicted in 1998 of criminal possession in the fourth degree of a hallucinogen. Information to Establish Prior Conviction, *DeJohn*, 05-CR-347 (N.D.N.Y. Feb. 15, 2007), ECF No. 313. He was found guilty and his guidelines range was 235 to 293 months. DeJohn, who was 34 years old at the time he was sentenced, was sentenced to life in prison. *See also United States v. Cammacho*, 462 F. App'x 81 (2d Cir. 2010) (affirming the conviction).

     In *United States v. Gonzalez-Ramirez*, 06-CR-97 (ML) (D.R.I.), the defendant was indicted in 2006 on a 10-life cocaine charge. When plea negotiations broke down the day before trial started, the government filed a prior felony information based on a 15-year-old conviction for which Gonzalez-Ramirez had been sentenced to four months in jail. Information to Establish Prior Conviction, *Gonzalez-Ramirez*, 06-CR-97 (D.R.I. Feb. 6, 2007), ECF No. 29. A jury found Gonzalez-Ramirez guilty. Prior to imposing the mandatory 20-year sentence, the judge said to the government, "I recognize you do this at the behest of your superiors. But I can't sit here today and impose this sentence *without saying it's wrong*, and you can take that message to whoever you think might listen." *Gonzalez-Ramirez*, 561 F.3d 22, 31 (2009) (Merritt, J., concurring) (affirming the conviction) (emphasis in original) (quoting sentencing transcript). In his concurring opinion confirming Gonzalez-Ramirez's conviction on appeal, Judge Gilbert Merritt wrote:

> I concur in the Court opinion, but I agree with the District Court that the prosecution's decision to seek a mandatory sentence of 20 years under 21 U.S.C. § 851 passes all understanding . . . . [T]his is a 20-year sentence for a nonviolent crime by a defendant with a serious mental illness. His incarceration will cost the American taxpayers in today's dollars somewhere between $600,000 and $1,000,000. With some carefully monitored rehabilitation treatment, it is possible that he could be released in just a few years. Like the District Judge, I think that the prosecution's purely discretionary decision to ratchet up this sentence to 20 years is misguided and ought to be reconsidered when the judgment becomes final.

*Id.*

    [149]    Midyett would have been a candidate for the Brooklyn District Attorney's Drug Treatment Alternative-to-Prison ("DTAP") program, which

> targets drug-addicted defendants arrested for nonviolent felony offenses who have previously been convicted of one or more nonviolent felonies. Qualified

Second, the greater the trial penalty in any plea bargaining situation, the greater the risk that innocent people will plead guilty. If Kupa had gone to trial and lost, his trial penalty would have been the rest of his life beyond age 45, which is when he will get out of prison based on the sentence I imposed. When guilty plea discounts are that dramatic and that certain, some innocent people will plead guilty.[151] I have written elsewhere that there are features of our federal system that ameliorate the "innocence problem" created by plea bargaining,[152] but that problem exists, and it is no doubt most acute in the class of cases created by the government's use of prior felony informations.

Third, even if the government's use of prior felony informations accomplished nothing other than the inducement of guilty pleas from actually guilty people, it would still be an undesirable outcome. Trials have become rare events in our system. In 1980, 81% of federal convictions were the product of guilty pleas.[153] Now that number is 97%.[154]

---

defendants enter a felony guilty plea and receive a deferred sentence that allows
them to participate in a residential therapeutic community (TC) drug treatment
program for a period of 15 to 24 months. Those who successfully complete the
program have their charges dismissed; those who fail are brought back to court
by a special warrant enforcement team and sentenced to prison.

*Drug Treatment Alternative-to-Prison*, KINGS COUNTY DISTRICT ATTORNEY'S OFFICE,
http://www.brooklynda.org/dtap/prog-updates.html. DTAP is one of the programs the Attorney General applauded in his remarks to the Vera Institute of Justice in 2009. *See* Holder, Keynote at Vera, *supra* note 128.

[150]    Holder, Keynote at Vera, *supra* note 128.

[151]    This is especially true given the fact that in many cases the felony drug convictions that gave rise to the prior felony information come into evidence at trial. If Kupa had gone to trial and presented a defense that he innocently associated with his brother and the other alleged co-conspirators, and was unaware of their drug trafficking activities, his prior convictions would have become admissible in evidence under Federal Rule of Evidence 404(b) to prove his knowledge of the drug trafficking going on around him. *See United States v. Paulino*, 445 F.3d 211, 220-23 (2d Cir. 2006); *United States v. Martino*, 759 F.2d 998, 1004-05 (2d Cir. 1985).

[152]    Gleeson, *Sentencing Commission and Prosecutorial Discretion*, at 653-55, *supra* note 69 (citing to case mix and compensation regime for appointed counsel in federal system to distinguish degree of "innocence problem" in comparison with state systems).

[153]    Marc L. Miller, *Domination & Dissatisfaction: Prosecutors as Sentencers*, 56 STAN. L. REV. 1211, 1252 n.150 (2004).

[154]    U.S. SENTENCING COMM'N, 2012 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS fig. C (2012). That rate has hovered over 95% in the last five years and, in fact, has been slowly creeping upwards. *Id.* (depicting rate of 96.3% in 2008 and 2009, 96.8% in 2010, and 96.9% in 2011). Prior felony informations are by no means the sole reason for the declining trial rate. There are mandatory minimums outside the drug trafficking setting, including the ones in 18 U.S.C. § 924(c) and in the child pornography laws, that are used in the same way.

An excessively high rate of guilty pleas is unhealthy for our justice system. It reduces transparency and for that reason alone diminishes the quality of justice.[155] The sentencing outcomes after defendants are convicted at trial ought to be the benchmarks for sentencing outcomes in cases where the defendant has pled guilty. But when almost everyone pleads guilty, the norm is not what happens after trial but rather the sentences resulting from plea agreements themselves.[156]

In addition, when only 3% of sentenced defendants have gone to trial, it is no longer an efficient use of a prosecutor's time to prepare her case for trial prior to indictment. If all you'll ever need is the probable cause necessary to indict, there's not much incentive to

---

More importantly, the Sentencing Guidelines themselves generally establish sentencing ranges that are so harsh that prosecutors can easily induce guilty pleas by engaging in Guidelines factor bargaining. *See supra* note 69.

     The Sentencing Commission does not keep track of the percentage of defendants who go to trial and are acquitted, but the Administrative Office of the United States Courts does, and it is tiny. Of the 97,445 cases disposed of in Fiscal Year 2012, only 392 (0.4%) resulted in acquittals. *See* Administrative Office of the United States Courts, 2012 Annual Report of the Director, Table D-4, *available at* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2012/appendices/D04Sep12.pdf (last visited Oct. 9, 2013).

    [155]    STUNTZ, *supra* note 76, at 302 ("Guilty pleas, especially ones that happen early in the process, are largely invisible. So is the bargaining that lies behind them. That is a modest problem or no problem at all when the number of criminal trials is high: the public can see how the system functions in a large fraction of its cases, and prosecutors and defense attorneys alike must strike plea bargains with an eye toward likely trial outcomes. When trials are rare events, as is the case today, the public sees little. And when prosecutors can dictate trial outcomes, trials do not constrain the one-sided bargains the parties strike. Plea bargains are no longer a means of settling easy cases, which is their proper role. Rather, guilty pleas and the quick bargains that precede them have become the system's primary means of judging criminal defendants' guilt or innocence. Given the quick and dirty character of the bargains, the judging is bound to be done badly."); *see also* Gerard E. Lynch, *Our Administrative System of Criminal Justice*, 66 FORDHAM L. REV. 2117, 2123 (1998) ("In fact, however, society is not relying on the judiciary to decide guilt in these cases. The substantive evaluation of the evidence and assessment of the defendant's responsibility is not made in court at all, but within the executive branch, in the office of the prosecutor. The brief formal procedure in court obscures what can be an invisible, but elaborate and lengthy process of adjudication of the defendant's guilt. This process is rarely governed by formal legal standards, other than the basic definitions of offenses, and the procedures by which it operates are not usually written down anywhere.")

    [156]    Gerard E. Lynch, *Screening Versus Plea Bargaining: Exactly What Are We Trading Off?*, 55 STAN. L. REV. 1399, 1401-2 (2003). ("In a system where ninety percent or more of cases end in a negotiated disposition, it is unclear why the "discounted" punishment imposed in that ninety percent of cases should not rather be considered the norm. . . . Given the extreme severity of sentencing in the United States by world standards, however, it is hard to take seriously the notion that ninety percent of those serving our remarkably heavy sentences are the beneficiaries of "bargains".")

develop more than probable cause.[157]  Since plea agreements are generally conditioned on prompt guilty pleas, no motion practice, and minimal Rule 16 disclosure, many cases receive only the scrutiny the grand jury process affords.  It's important to bear in mind just how shallow that scrutiny is.

Grand juries are frequently blamed for not being much of a check on federal prosecutors' ability to bring criminal charges, but that's not the fault of grand jurors themselves.  Our system permits indictments to be returned based on an *ex parte* presentation consisting entirely of inadmissible evidence.[158]  Even evidence the prosecutor knows will be suppressed if motion practice occurs post-indictment is permitted in the grand jury.[159]  The prosecutor may properly withhold from the grand jury evidence that proves the target's innocence of the crime under investigation.[160]  Mere probable cause, not proof beyond a reasonable doubt, suffices, and a bare majority of the grand jurors, not unanimity, gets the job done.[161]  Given these features of our grand jury process, it's hard to blame the members of the grand jury for not living up to the idealized notion of a group of citizens acting as a buffer between an overreaching prosecutor and the people.

The case law that shaped the role of the grand jury reflects a commitment to keeping grand jury proceedings secret and free of litigation and also a firm belief that any resulting errors in the screening function of that body will be corrected at trial.  In explaining for

---

[157]     This discussion assumes that a grand jury indictment is obtained in all cases.  In fact, in many cases even the right to have a grand jury review the case is waived by a pleading defendant.  *See* Lynch, *Our Administrative System of Criminal Justice*, *supra* note 155, at 2122.

[158]     *Costello v. United States*, 350 U.S. 359, 409 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits.").

[159]     *United States v. Calandra*, 414 U.S. 338, 349-52 (1974) (exclusionary rule not applicable to grand jury proceedings).

[160]     *United States v. Williams*, 504 U.S. 36, 51-55 (1992) (supervisory power of federal courts over grand jury practice is limited to enforcing Federal Rules of Criminal Procedure and does not permit courts to require substantial exculpatory evidence to be presented to grand jury).

[161]     *See* Fed. R. Crim. P. 6(b).

the Court in *Calandra* why evidence seized in violation of the Fourth Amendment may properly be used in the grand jury, Justice Powell found comfort in the belief that

> [t]he incentive to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim. For the most part, a prosecutor would be unlikely to request an indictment where a conviction could not be obtained.[162]

And in refusing to impose an obligation on prosecutors to present substantial exculpatory evidence to the grand jury, the Court in *Williams* reasoned that such an obligation would convert an accusatory process into an adjudicative one. It adopted Blackstone's approach that "'the finding of an indictment is only in the nature of an enquiry or accusation, *which is afterwards to be tried and determined.*'"[163]

The notion that defects in the grand jury's screening function will come out in the wash at trial is sound only if a meaningful percentage of cases go to trial. But when prosecutors can threaten defendants with outlandish and unjust sentences if they go to trial, we get what we have today – a trial rate so tiny that we can no longer be confident that the adversary process will correct the charging errors that the grand jury process tolerates.

The problem is not limited to the absence of *adversarial* challenges to indicted cases. *Prosecutors* will pay exquisite attention to the details of a case only during trial preparation. Preparing a case for trial is extremely labor-intensive for them and the agents working with them – indeed, that's why prosecutors use the powers Congress and the Sentencing Commission gave them to avoid trials. When preparing for trial, they actually debrief all the witnesses, find more witnesses, subpoena additional documentary evidence, and go back over all

---

162    *Calandra*, 414 U.S. at 351.
163    *Williams*, 504 U.S. at 51 (quoting Blackstone) (emphasis added).

the evidence they already had. The results significantly enhance both the quantity and quality of the information that was available at the time of indictment. That can strengthen the case and even suggest the appropriateness of additional and more serious charges and even additional defendants. But it can also have the opposite effect, unearthing facts that call the charges into question or warrant leniency even if the charges are sound.

I don't mean to suggest that because criminal trials are disappearing federal prosecutors are running wild, obtaining indictments based on illegally seized evidence and withholding exculpatory material from grand juries. I have no reason to believe they act in anything other than good faith in their grand jury presentations. But in a world where 97% of sentenced defendants plead guilty pursuant to agreements that require such pleas to occur before the prosecutor prepares the case for trial, the sharpened focus on the offense and the defendant that results from such trial preparation rarely occurs. The thin presentation needed for indictment is hardly ever subjected to closer scrutiny by prosecutors, defense counsel, judges or juries. The entire system loses an edge, and I have no doubt that the quality of justice in our courthouses has suffered as a result.

G. *The 2013 Holder Policy*

Two months ago, in an address to the American Bar Association, Attorney General Holder announced DOJ's new policy (the "2013 Holder policy") regarding mandatory minimums and prior felony informations.[164] He acknowledged how "coldly efficient" we've become at incarcerating people, and that almost half of the bloated federal prison population –

---

[164]     Holder, Remarks at the Annual Meeting of the ABA's House of Delegates, *supra* note 1.

which has grown exponentially since Congress enacted those mandatory minimums – is "serving time for drug-related crimes, and many have substance abuse disorders."[165]

In a time where the institutions responsible for sentencing policy function the way they are supposed to, there would be no need to wait for prosecutors to put an end to their own cruel, ineffective and needlessly expensive practices. But our country is in a different time right now, and once again Attorney General Holder is leading the way toward needed change.

The new policy specifically addresses both the initial decision to charge mandatory minimums and the separate decision to file a prior felony information.

1. *Structuring the Discretion to File Mandatory Minimums*

Attorney General Holder told the ABA as follows:

I have today mandated a modification of the Justice Department's charging policies so that certain low-level, nonviolent drug offenders who have no ties to large-scale organizations, gangs, or cartels will no longer be charged with offenses that impose draconian mandatory minimum sentences. They now will be charged with offenses for which the accompanying sentences are better suited to their individual conduct, rather than excessive prison terms more appropriate for violent criminals or drug kingpins. By reserving the most severe penalties for serious, high-level, or violent drug traffickers, we can better promote public safety, deterrence, and rehabilitation – while making our expenditures smarter and more productive.[166]

As for the policy itself, it states as follows:

[I]n cases involving the applicability of Title 21 mandatory minimum sentences based on drug type and quantity, prosecutors should decline to charge the quantity necessary to trigger a

---

[165]     *Id.* In 1986, when the ADAA was enacted, the federal prison population was 44,408. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 1986 2 tbl. 2 (1987). By 1994, it was 95,034; by 2004, it was 180,238. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2004 3 tbl. 3 (2005); U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES, 1994 66 tbl. 5.1 (1996). In 2012 there were 217,815 prisoners in the custody of the federal government. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2012 – ADVANCE COUNTS 2 tbl. 1 (2013).

[166]     Holder, Remarks at the Annual Meeting of the ABA's House of Delegates, *supra* note 1.

mandatory minimum sentence if the defendant meets each of the following criteria:

- The defendant's relevant conduct does not involve the use of violence, the possession of a weapon, the trafficking of drugs to or with minors, or the death or serious bodily injury of any person;

- The defendant is not an organizer, leader, manager or supervisor of others within a criminal organization;

- The defendant does not have significant ties to large-scale drug trafficking organizations, gangs, or cartels; and

- The defendant does not have a significant criminal history. A significant criminal history will normally be evidenced by three or more criminal history points but may involve fewer or greater depending on the nature of any prior convictions.[167]

Since my focus here is on the filing of prior felony informations, not the initial decision to bring mandatory minimum charges, my principal concerns about this aspect of the new DOJ policy are set forth briefly in the margin.[168] But notwithstanding those concerns, the

---

[167] 2013 Holder Policy, *supra* note 1, at 2.

[168] One of the facts that can result in the charging of a mandatory minimum is that the defendant's "relevant conduct" involves the possession of a weapon. That sounds logical; why should someone who possessed a weapon be considered "nonviolent?" But those of us who actually have to deal with that "relevant conduct" principle know better. The guidelines provide that a defendant is held accountable for a gun possessed by someone else if that person's conduct is in furtherance of the criminal activity and reasonably foreseeable. U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a)(1)(B) & cmt. 2 (2012). *See generally* GORDON MEHLER, JOHN GLEESON & DAVID C. JAMES, FEDERAL CRIMINAL PRACTICE: A SECOND CIRCUIT HANDBOOK § 42-6 (13th ed. 2013). Since guns are widely known to be tools of the drug trade, a gun possessed by another participant in the defendant's drug trafficking offense can be charged to the defendant no matter how nonviolent the defendant himself may be and even if he neither possessed the gun nor knew someone else did. *See United States v. Batista*, 684 F.3d 333, 343-44 (2d Cir. 2012) (affirming adjustment for defendant even though there was no firearm in physical proximity to him and he was not informed by others that they possessed firearms); *United States v. Stevens*, 985 F.2d 1175, 1188–89 (2d Cir. 1993) (specifically rejecting argument that government had to prove defendant's actual knowledge of firearm where possession was reasonably foreseeable). In short, the mere fact that a defendant's relevant conduct includes the possession of a gun is cause for a more in-depth inquiry, but it should never automatically subject him to a mandatory minimum.

Second, the new policy predictably allows for the continued use of mandatory minimums to coerce cooperation. That is clearly the purpose of the requirement that the defendant "not have significant ties to large-scale drug trafficking organizations, gangs, or cartels." As discussed in *Dossie*, it's impossible to extricate from any discussion of the drug offense mandatory minimums federal prosecutors' longstanding use of those provisions to "flip" defendants. 851 F. Supp. 2d at 487. But it's not fair to punish a low-level drug trafficking defendant with harsh sentences intended only for his bosses because he declines to cooperate. Cooperation is supposed to afford a break from an otherwise deserved sentence; it violates a basic principle of our system to impose an undeservedly harsh sentence based on a refusal to cooperate. *Id.* at 488. Modern federal prosecutors have lost sight of this principle, and have explicitly sought increased sentences not because the crimes at

new policy is promising. Tone matters a lot, and the nation's top law enforcement officer has said out loud what everyone has known for too long: The drug trafficking sentences that we've been dishing out regularly for more than 20 years are unjust, counterproductive, fiscally irresponsible and racially discriminatory.[169] There's wiggle room in the 2013 Holder Policy, as there is in every policy statement issued by Main Justice, and AUSAs looking to undermine its intended effect will find ways to do so. But if it is implemented in the same spirit in which it was promulgated, fewer nonviolent low-level drug traffickers will be charged with onerous mandatory minimums Congress explicitly meant only for their bosses.[170]

---

issue warrant them, but solely because it would make it easier for the government to procure the cooperation of the people charged with those crimes. Frank O. Bowman, III, *A More Perfect System: Twenty-Five Years of Guidelines Sentencing Reform Institutions*, 58 STAN. L. REV. 235, 252 (2005) ("To an increasing degree, the Department has come to justify its requests for tougher sentencing rules, not on the ground that offenders actually deserve the higher sentences, but simply because the threat of the higher sentence provides a greater inducement for defendant cooperation.").

      Finally, the significance of a particular defendant's "ties to large-scale drug trafficking organizations, gangs, or cartels" will inevitably be in the eyes of the beholder. Street-level drug traffickers don't make their own cocaine or heroin, so there are always "ties" of some sort to at least one of the organizations that do. Depending on the spirit with which line prosecutors implement the new policy, truly low-level offenders, even addicts with minimal roles, may readily be deemed to have significant enough ties to warrant charging them with mandatory minimums in order to coerce their cooperation. In sum, I harbor no illusions; it will be difficult indeed to wean federal prosecutors off their dependence on mandatory minimums to coerce the cooperation of those who should not face those onerous charges.

[169]    Holder, Remarks at the Annual Meeting of the ABA's House of Delegates, *supra* note 1 ("[I]t's time to ask tough questions about how we can strengthen our communities, support young people, and address the fact that young black and Latino men are disproportionately likely to become involved in our criminal justice system – as victims as well as perpetrators. We also must confront the reality that – once they're in that system – people of color often face harsher punishments than their peers. One deeply troubling report, released in February, indicates that – in recent years – black male offenders have received sentences nearly 20 percent longer than those imposed on white males convicted of similar crimes. This isn't just unacceptable – it is shameful. It's unworthy of our great country, and our great legal tradition. And in response, I have today directed a group of U.S. Attorneys to examine sentencing disparities, and to develop recommendations on how we can address them.").

[170]    The flexibility the new DOJ Policy affords prosecutors in evaluating criminal history is both necessary and admirable. The Sentencing Commission has recommended that Congress "consider marginally expanding the safety valve at 18 U.S.C. § 3553(f) to include certain offenders who receive two, or perhaps three, criminal history points under the guidelines." MANDATORY MINIMUM REPORT, *supra* note 8, at 355-56. As I stated in *Dossie*, "this recommendation is too tepid, given how easy it is for nonviolent offenders to rack up criminal history points, especially while under supervision." *Dossie*, 851 F. Supp. 2d at 482 n.5 (citing U.S. SENTENCING GUIDELINES MANUAL § 4A1.1(d) (2011)). Rather than recommend that safety valve eligibility be pegged to an arbitrary number of criminal history points, the Commission should take its cue from DOJ and urge Congress to allow judges to consider "the nature of any prior convictions" in deciding whether safety valve relief should be available. *Cf.* U.S. SENTENCING GUIDELINES MANUAL § 4A1.3(b)(1) (2011) (allowing for a downward criminal history departure where the "criminal history category substantially overstates the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes").

On the other hand, to the extent it addresses the filing of prior felony informations, the 2013 Holder Policy is not promising at all.

2. *The Decision to File a Prior Felony Information – the Defects in the New Policy and the Need for Repairs*

Under the 2013 Holder Policy, "[p]rosecutors should decline to file an information pursuant to 21 U.S.C. § 851 unless the defendant is involved in conduct that makes the case appropriate for severe sanctions."[171]  When determining whether an enhancement is appropriate, prosecutors are to consider the following factors:

- Whether the defendant was an organizer, leader, manager, or supervisor of others within a criminal organization;

- Whether the defendant was involved in the use or threat of use of violence in connection with the offense;

- The nature of the defendant's criminal history, including any prior history of violent conduct or recent prior convictions for serious offenses;

- Whether the defendant has significant ties to large-scale drug trafficking organizations, gangs or cartels;

- Whether the filing would create a gross sentencing disparity with equally or more culpable co-defendants; and

- Other case-specific aggravating or mitigating factors.[172]

The first defect in this policy is the starting point is wrong.  One of the pernicious effects of DOJ's prior felony informations policies since 1992 is that they created an attitude that prior felony informations are *presumptively* to be filed whenever a defendant has prior drug felony convictions.  The new policy's description of the decision it purports to control – whether prosecutors "should *decline* to file" a prior felony information – perpetuates that error.  Indeed,

---

[171]     2013 Holder Policy, *supra* note 1, at 3.
[172]     *Id.*

despite its criticism of DOJ's use of prior felony informations, the recent *Young* case buys into that mindset by repeatedly characterizing decisions not to file them as a "waiver" or an option the prosecutor has "waived."[173]

It is inconsistent with the history and purpose of § 851 to say the prosecutor's mission is to make a decision about whether to decline to file a prior felony information. DOJ itself lobbied for and received, in the 1970 legislation described earlier, a different mission: to carefully choose from the pool of defendants eligible for recidivist enhancements the hardened professional drug traffickers who should face those especially harsh mandatory punishments. The job is to *select* the deserving few, not to include all eligible defendants absent an affirmative decision to decline.

Second, even if the approach were correct, the factors set forth in the 2013 Holder Policy do nothing to help isolate the most culpable, professional, and hardcore of the recidivist drug trafficking defendants from the large pool of recidivist drug traffickers. Instead, an AUSA can easily conclude that any one of the factors that will typically result in a mandatory minimum charge (aggravating role, use or threat of violence, ties to an enterprise, and significant criminal history) will also justify the filing of a prior felony information, as will an unspecified array of "[o]ther case-specific aggravating . . . factors." An AUSA who wishes to threaten to file or to actually file a prior felony information against someone facing a 5-40 count or a 10-life count will always find comfort in the new policy. And experience has taught us that when prosecutors are free to invoke these enhanced mandatory punishments whenever they want to, they use them for the purposes discussed above, which have nothing to do with enhanced culpability and everything to do with punishing the exercise of constitutional rights.

---

[173]     *E.g.*, 2013 WL 4399232 at *2, *6.

There's nothing wrong with the 2013 Holder Policy that the Attorney General can't fix. For starters, I respectfully suggest that DOJ affirmatively repudiate the 1992 decision to include prior felony informations among "the most serious, readily provable offenses" that federal prosecutors must presumptively bring in every case. The whole point of enacting § 851 was to establish, *at DOJ's insistence*, the exact opposite approach: automatic applicability was repealed, and recidivist enhancements were to be invoked only after DOJ has selected the subset of drug trafficking recidivists that truly deserve them.

Second, DOJ should explicitly prohibit the use of prior felony informations to coerce defendants into pleading guilty or to punish those who refuse to do so, and it should enforce the prohibition. No matter how entrenched that practice is, and how inured we've all become to it, it isn't right. It forces too many people to waive their right to a trial, and it exacts a price for going to trial that no one should have to pay. Is it ever appropriate to use the power to file a prior felony information in plea negotiations? No, for the simple reason that there is no check on the prosecutor's chosen sentencing strategy if one is actually filed.[174]

---

[174] The inability of judges to act as a check on prosecutorial power is what distinguishes this type of bargaining from the type I have endorsed and asked the Commission to encourage. *See* Gleeson, *The Sentencing Commission and Prosecutorial Discretion*, *supra* note 69. Among the several reasons prosecutors should be permitted to engage in bargaining that results in sentences substantially below those meted out by the Guidelines themselves is that allowing them to do so ameliorates the severity of an overly-harsh Guidelines regime. *See id*. at 658. However, when they refuse to do so, that is, when prosecutors insist for whatever reason that defendants bear the full brunt of the Guidelines' severity, judges are there as a check. If the case involves a circumstance of a kind or to a degree not adequately considered by the Commission, or a sentence below the applicable range is sufficient but no greater than necessary to achieve the goals of sentencing, a judge is authorized to sentence below the Guidelines range. The essential evil of prior felony informations is there is no such check on government power; judges are required to impose sentences at least as long as the enhanced mandatory minimums they trigger. Simple justice demands that if a defendant is to be sentenced to twice the original mandatory minimum, or to life in prison, that is because a judge, after considering all the relevant factors, *selects* such a sentence, not because the government has unilaterally mandated it. I'm not suggesting prosecutors shouldn't argue for such sentences if they deem them appropriate, and indeed I think they should appeal when they believe judges have unreasonably refused to impose them. *See United States v. Ovid*, No. 09-CR-216 JG, 2010 WL 3940724, at *9-10 (E.D.N.Y. Oct. 1, 2010). But a system that allows a prosecutor to mandate harsh sentences no matter how unjust the sentencing judge may find them to be breeds injustice and disrespect for our criminal justice system.

Is there any appropriate use for a prior felony information? Yes: When an AUSA, guided by factors that focus on enhanced *culpability*, not on the exercise of constitutional rights, identifies a defendant to be among the especially culpable subset of professional narcotics traffickers whose crimes and criminal pasts make them deserving of the prior felony information sledgehammer. Just as certain mitigating factors must be present before a defendant may avoid a mandatory minimum, there ought to be a list of aggravating factors that must all be present before a prior felony information may be filed.[175]

In *Bordenkircher v. Hayes*, the Supreme Court stated as follows: "There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse."[176] If anything, both the breadth of prosecutorial discretion and the potential for its abuse have been magnified in the 35 years since that 5-4 decision. A footnote to that statement further observed that "[t]his potential has led to many recommendations that the prosecutor's discretion should be controlled by means of either internal or external guidelines."[177] This is just such a recommendation. As it currently stands, the DOJ policy does nothing to control a prosecutor's discretion to file a prior felony information. Every factor that would cause a line prosecutor to level a mandatory minimum charge to begin with is endorsed by the new policy as a reason to file a prior felony information as well. Prosecutors will continue regarding the filing of prior felony informations as automatic.

---

[175] In *Dossie*, I advanced specific suggestions with regard to the decision to file mandatory minimums. I did so not because judges are well-positioned to suggest specific policy recommendations to prosecutors but because the legislative history so clearly set forth the exact kinds of drug traffickers (*i.e.*, leaders and managers) at whom those provisions were targeted. 851 F. Supp. 2d at 485-87. There is no analogous directive here. To the contrary, Congress made the filing of prior felony informations discretionary in 1970 precisely because DOJ said *it* wanted the opportunity to narrow the field of eligible defendants to those who are truly deserving of prior felony informations. The Attorney General should seize that opportunity and promulgate a policy that will give prior felony informations a more nuanced and appropriate (and much narrower) role in federal law enforcement.

[176] 437 U.S. at 365.

[177] *Id.* at 373 n. 9.

They will continue to use them abusively, that is, they will condition the withholding of the excessive mandatory sentences they trigger only if the defendant forfeits his right to trial by jury (and, in some cases, also agrees to cooperate). They will insist on their use as sledgehammers against the ever-dwindling few who have the temerity to ask for the trial the Constitution guarantees.

Finally, there is an obvious need to provide relief to the many current federal inmates who fell victim over the years to the abusive practices discussed here. The Attorney General has properly emphasized the need "to usher in a new approach," one that "ensure[s] that incarceration is used to punish, deter and rehabilitate – not merely to warehouse and forget."[178] Part of that approach must be to revisit those who until now have been warehoused and forgotten. Nowhere is it written that the life sentences of Charles Doutre, Dennis Capps, and the many others like them are irrevocable, or that Tyquan Midyett or Melissa Ross must necessarily serve all 20 years of their equally indefensible sentences. The Attorney General can right those wrongs and the many others like them if he has the will to do so and if the conduct of those inmates since they were sentenced suggests it is appropriate. The United States Attorneys around the country have the power to go back into courtrooms and to request sentencing judges (or other judges in the same districts if those judges are no longer serving) to vacate sentences that were mandated by prior felony informations and amounted to miscarriages of justice. Any claim that such a request can only be made if there's a defect in the underlying proceedings would be just an excuse. The underlying defect is the abuse of prosecutorial power that produced the sentences in the first place. The individuals serving those bonecrushing sentences will certainly not object to a request for remedial relief, and if the judges choose to vacate and

---

[178]     Holder, Remarks at the Annual Meeting of the ABA's House of Delegates, *supra* note 1.

resentence on the joint request of the parties, justice will have been served. If they don't, nothing will have been lost except the judge's opportunity to correct an injustice.[179]

I mention the foregoing because the paradigmatic avenue for relief of the sort we need – executive clemency – has been essentially blocked for years. The Attorney General's leadership can also extend to helping to reinvigorate executive clemency. Given the extremely high costs of incarceration and the proven efficacy of alternatives to incarceration in reducing recidivism rates, it is important to focus on clemency as another form of needed sentencing reform. There is good reason to believe that the benefits of a robust clemency process can outweigh the costs, political and otherwise, of any erroneous decisions, particularly if the recommendations for clemency are the result of a process that includes all the relevant stakeholders.[180]

## G.      Conclusion

I sentenced Lulzim Kupa to a 132-month term of imprisonment for a variety of reasons. The most important by far was because I could, that is, I was not required to impose a sentence of life in prison for his nonviolent drug trafficking offense. And the only reason for that is Kupa buckled under the enormous pressure that looming sentence placed on him. The prior felony information ushered that 800-pound gorilla into the case at the eleventh hour and it took the case over. Once it was filed, everything that followed was done with all eyes on the draconian sentence that a jury's verdict of guilty would require me to impose. It snuffed out an imminent trial at which Kupa wanted to do what our Constitution and Bill of Rights guarantee

---

[179]      Judge Gilbert Merritt suggested this type of government-initiated postconviction relief even as he voted to affirm the draconian 20-year sentence in *United States v. Gonzalez-Ramirez*, discussed above at note 148. *See* 561 F.3d at 31 (Merritt, J., concurring) ("I think that the prosecution's purely discretionary decision to ratchet up this sentence to 20 years is misguided and ought to be reconsidered when the judgment becomes final.").
[180]      *See* Rachel E. Barkow, *The Politics of Forgiveness: Reconceptualizing Clemency*, 21 FED. SENT'G REP. 153 (2009); *see also* Editorial, *Pardon Rates Remain Low*, *supra* note 119.

him: hold the government to its burden of proving him guilty beyond a reasonable doubt. And indeed the desire to snuff out that trial was reason the sole reason the prosecutor filed it.

Throughout, I have assumed that both the drug offense mandatory minimums and the onerous enhancements triggered by prior felony informations are here to stay, at least in some form. After all, as a circuit judge wrote in 2009, "[t]he Judicial Conference of the United States for almost 20 years, and the Sentencing Commission for almost 10 years, have pleaded with the judiciary committees of Congress to do something about the serious injustices that these long, mandatory minimum sentences impose – to no avail."[181] I have also assumed the constitutionality of using prior felony informations as bludgeons in federal prosecutors' efforts to get defendants to plead guilty. But arguing that it is not illegal for prosecutors to use prior felony informations to produce the guilty pleas and sentences described above is no way to defend such a wayward policy. Attorney General Holder's admirable leadership toward sentencing reform should lead him to refocus his attention on prior felony informations. If DOJ cannot exercise its power to invoke recidivist enhancements in drug trafficking cases less destructively and less brutally, it doesn't deserve to have the power at all.

John Gleeson, U.S.D.J.

Dated: October 9, 2013
      Brooklyn, New York

---

[181] *Gonzalez-Ramirez*, 561 F.3d at 31 (Merritt, J., concurring).